THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

| | |
|---|---|
| RODNEY JONES, et al. | PLAINTIFFS |
| v. | CIVIL ACTION NO. 3:20CV00308-MPM-RP |
| THE RAYMOND CORPORATION | DEFENDANT |

**DEFENDANT THE RAYMOND CORPORATION'S BRIEF IN SUPPORT OF MOTION TO STRIKE THE TESTIMONY OF JOHN MEYER, Ph.D., P.E.**

**INTRODUCTION**

This case arises out of an incident on August 29, 2019, at a FedEx Supply Chain warehouse located in Olive Branch, Mississippi. Plaintiff Rodney Jones alleges that he was injured while operating a Model 4250 stand-up counterbalanced lift truck manufactured by The Raymond Corporation ("Raymond"). He alleges that the lift truck he operated at the time of the incident was defectively designed and unreasonably dangerous. His wife, Deangela Battle, alleges a derivative loss of consortium arising out of Mr. Jones' injuries from the accident. Plaintiffs seek compensatory and punitive damages.

Plaintiffs' standard-bearer to support their defect claims is Dr. John Meyer, Ph.D., P.E. – a well-educated engineer with virtually no prior experience with lift trucks of any kind, let alone the Model 4250 Raymond lift involved in this case. Given Dr. Meyer's lack of experience, failure to engage in the scientific method in this case, and failure to support his theories with any scientific analysis that will assist the trier of fact, Dr. Meyer should be precluded from testifying.

Dr. Meyer opines that the Model 4250 operated by Mr. Jones at the time of the accident was defective because: (a) it lacked a door that would trap the operator into the operator's compartment, (b) its pedal design was defective, (c) it lacked a presence sensing switch in the backrest, and (d) the multifunctional control joystick allows an operator who loses balance to accelerate the forklift rearward.

1

Unless he wishes to characterize the act of reading as engaging in scientific methodology, Dr. Meyer has not performed **_any_** work to support his opinions. Instead, Dr. Meyer is simply parroting other litigation "experts" such as Thomas Berry and Jonathan Colton, whom Plaintiffs' counsel retained in prior lawsuits against Raymond that either resulted in the exclusion under *Daubert* (Berry) or similar admission standards, or a complete defense verdict despite presenting their opinions to juries (Colton). Rather than designate Mr. Berry or Dr. Colton here, Plaintiffs' counsel has now recruited a third engineer, and is attempting to use him as a mouthpiece for inadequate work performed by others, particularly Mr. Berry, while insulating Mr. Berry and Dr. Colton from the previously effective cross-examination at trial.

Plaintiffs' counsel document-dumped Dr. Meyer with thousands of pages of prior litigation files and expert reports. While Dr. Meyer claims to have reviewed/skimmed these documents, during a deposition in a case tried before a jury a few months ago,[1] it became abundantly clear that he was unfamiliar with the content of many of these documents which he uses to support his opinions. What is clear is that Dr. Meyer did not perform any independent engineering work, employed no engineering methodology to reach his opinions, and offers only *ipse dixit* (in some cases not even his own *ipse dixit*).

Dr. Meyer should be precluded from offering any opinions at trial for all of the following reasons:

1) Dr. Meyer is not qualified to offer design opinions related to the Raymond Model 4250 because he has no relevant experience, education, or training related to the design and operation of lift trucks, particularly the Model 4250.

2) Dr. Meyer's opinions are unreliable because:

    a) None of his design opinions are based on the application of a reliable engineering methodology; and

---

[1] The jury who heard Dr. Meyer's testimony on subjects he was permitted to testify on at trial returned a defense verdict after just over an hour of deliberations in November, 2021. Exhibit A, Judgment entered 11/10/2021 in *Anderson v. Raymond* ("Ex. A"); *see also* Exhibit B, Verdict Form filed 11/10/2021 in *Anderson v. Raymond* ("Ex. B") (finding the Model 4250 did not "contain[] an unreasonably dangerous condition, as claimed by the plaintiffs . . . .").

      b)     His backrest and control handle opinions are not relevant because he does not offer the opinion that any of these alternative designs actually *would have* prevented Mr. Jones' injuries – only that they *may have* prevented his injuries. Even with respect to the alternative designs Dr. Meyer says would have made a difference, that testimony is *ipse dixit*.

3)     Dr. Meyer's rear door opinions are universally rejected by the relevant scientific community as well as courts and juries nationwide.

4)     Dr. Meyer should not be permitted to act solely as the mouthpiece for other experts that have previously been excluded and are not proffering testimony in this case.

This Court should preclude Dr. Meyer from offering any opinions at trial.

## FACTUAL BACKGROUND

**I. GENERAL CASE BACKGROUND**

Raymond incorporates its description of the subject lift truck and accident described in its accompanying *Motion for Summary Judgment*, filed contemporaneously with this *Motion*.

**II. MOTION SPECIFIC BACKGROUND**

    **A.**     <u>**Dr. Meyer's Lack of Qualifications**</u>

Dr. Meyer is a mechanical engineer who has experience in accident investigation and failure analysis generally. Exhibit C, C.V. of John E. Meyer, Ph.D., P.E. ("Ex. C"), at p. 1.[2] But with respect to stand-up lift trucks:

- Dr. Meyer has never designed a stand-up lift truck. Exhibit D, Deposition Transcript of John E. Meyer, Ph.D., P.E., taken 12/9/2021 ("Ex. D"), at 93:21-23 ("Q . . . So you have not designed a stand-up forklift truck; correct? A . . . That is correct.").

- Dr. Meyer has never designed a component of a stand-up lift truck, other than coming up with mere concepts for alternative designs in the context of working in litigation for Plaintiffs' counsel over the last year or two. *Id.* at 93:24-94:17 (testifying that he has come up with concepts in litigation that "have not made it to

---

[2] For ease, Raymond is attaching excerpts of cited materials. Upon request, Raymond will furnish full versions of any cited document.

3

the prototyping or . . . testing sort of phase" and "you could argue that at least that constitutes design to some degree").

- Dr. Meyer has never designed a warning or instruction for a stand-up lift truck. Exhibit E, Deposition Transcript of John E. Meyer, Ph.D., P.E., taken 11/20/2020 in *Anderson v. Raymond* ("Ex. E"), at 27:15-18 ("Q. Dr. Meyer, you have not designed a warning or an instruction or a training manual for stand-up forklifts, correct? A. I have not.").

- Dr. Meyer has never been trained or certified to operate a Raymond Model 4250. *Id.* at 25:25-26:6 ("Q. Have you ever been trained on a Raymond 4250? A. No. Q. Have you ever been certified to operate a Raymond 4250? A. Well, other than certification to operate a stand-up forklift, not specifically identifying that model type.").[3]

- Prior to being retained by Plaintiffs' counsel, Dr. Meyer had never worked on any matters involving stand-up forklift trucks. Ex. D at 116:17-117:1; Ex. E at 24:5-8.

- Dr. Meyer only got certified as a stand-up lift truck operator after being retained by Plaintiffs' counsel to consult for purposes of litigation. Ex. E at 25:11-24 (testifying he got certified in 2020 by taking a short online class and doing stand-up forklift training at a local facility on Yale and Hyster stand-up forklifts), 20:15-21:13 (testifying Plaintiffs' counsel retained him for the *Anderson* case early in 2020, and initially retained him for a "Forklift Consulting Project" on or around October 4, 2019).

---

[3] OSHA regulations require an operator to be trained and certified on the specific equipment. 29 C.F.R. § 1910.178(l)(3) (addressing "Training program content" including truck-specific topics).

4

- Dr. Meyer is not an expert lift truck operator. *Id.* at 26:18-20 ("Q . . . Would you agree that you are not an expert operator? A. I would agree I'm not an expert operator.").[4]

- Dr. Meyer has never published any written work regarding forklifts. *See* Exhibit C (listing no publications on forklifts).

- Dr. Meyer is not a member, and has never communicated with, the ANSI B56.1 committee that promulgates safety standards for lift trucks. Ex. E at 24:17-25:7.

**B.    Dr. Meyer's Opinions**

Dr. Meyer provided an initial 148-page report, at the end of which he enumerated his 15 "Findings and Conclusions." Exhibit F, Report of John E. Meyer, Ph.D., P.E. dated 10/4/2021 ("Ex. F"), at 147-148. He contends:

1. Mr. Jones' injury was a direct result of the lack of a door on the forklift he was operating and was entirely preventable
2. The subject forklift's design represents an unacceptable risk of lower left leg injury
3. The addition of a door like the one Raymond currently offers for sale achieves acceptable risk
4. The Raymond 4250 does not meet the requirements of clause 7.20.2 of ANSI/ITSDF B56.1-2012
5. The Raymond 4250 does not meet the requirements of clauses 4.2.2.4 and 4.7.7.4 of ISO 3691-1:2011
6. In addition to a door, modifying the foot controls and operator presence sensing by utilizing a system like the Hyster-Yale Operator Sensing System can further reduce residual risk and likely would have prevented Mr. Jones' injury
7. Addition of a backrest-based operator presence sensor will promote operators utilizing a stability-enhancing five-point stance, allow compliance with ANSI/ITSDF B56.1 and ISO 3691-1, and may have prevented Mr. Jones accident
8. A multifunction control joystick designed so that it would not accelerate the forklift rearward in response to an operator who has lost his balance and is falling out of the forklift while holding onto the joystick would lower the risk of sustaining a crush injury such as the one sustained by Mr. Jones
9. All the alternative designs, applied in combination, provide the greatest level of protection against lower left leg injury

---

[4] Given this admission, even if he were to be permitted to testify, Dr. Meyer should not be permitted to offer opinions about Mr. Jones' conduct during the subject incident.

10. Despite frequent updates, ANSI B56.1 does not reflect state of the art engineering practice
11. Proper engineering design must recognize human factors in design, accommodating imperfect operator behavior
12. As Raymond does in the 4250, relying on administrative controls when engineering controls can be utilized does not achieve acceptable risk and is a direct result of an improper application of the hazard control hierarchy
13. Instructions to exit the machine in a tipover (or off-dock) incident are not in the operator's best interest
14. Accident data demonstrate riding out a tipover or off-dock accident is the safest action
15. Instruction for tipover or off-dock accident should make clear to exit only if it is obvious it can be accomplished safely

*Id.*

### C. Dr. Meyer's (Lack of) Methodology

Dr. Meyer's file consists of thousands of pages of materials provided to him by Plaintiffs' counsel, much of it involving other litigation in which Dr. Meyer was not involved. *See* Ex. E at 112:21-117:12, 124:20-131:14, 133:7-136:15. When asked in his deposition in *Anderson* if he had actually read all the materials that Plaintiffs' counsel has shared with him, Dr. Meyer conceded he has not read everything, and instead he "tried to review all the materials that [he has], certainly some of it has not been reviewed thoroughly." *Id.* at 112:12-20.

Even though the bulk of Dr. Meyer's "work" in this case merely involved reviewing materials provided to him, Dr. Meyer agrees that the mechanical engineering methodology includes numerous steps:

- a concept for the product or a change to the product;
- initial design drawings;
- selection of components;
- bench testing for reliability, maintainability, and longevity;
- building prototypes;
- lab testing on the prototypes;
- continued analysis and revisions;
- field testing; and
- creation of instruction manuals and warnings.

6

*Id.* at 77:15-79:20.

Dr. Meyer conducted no testing in this case. Ex. D at 19:16-19. He offered opinions about doors generally, and believes "there are multiple viable door designs," but if he had to pick a door design he would pick the Raymond optional rear operator guard. Ex. F at 122.[5]

Though Dr. Meyer claims he performed "analysis" of whether certain of his alternative designs *would* have made a difference in Mr. Jones' accident, *id.* at 37:14-38:20 (testifying about a second pedal), he lacks critical data points to make such a determination. Specifically, Dr. Meyer does not know the speed of the subject lift truck at the time of impact. *Id.* at 32:19-33:3. Nor does Dr. Meyer know how close the subject lift truck was to the point of impact when Mr. Jones removed his left foot from the operator's platform. *Id.* at 33:1-7, 34:24-35:1.

Another of Plaintiffs' liability expert witnesses, Dr. Kerrigan, even contradicts Dr. Meyer by conceding that the alternative proposed designs could have, but not *would have* made a difference in Mr. Jones' accident. Ex. H, Deposition Transcript of Jason Kerrigan, Ph.D., taken 12/8/2021 ("Ex. H"), at 31:17-21 ("Q. So, it's possible the left-foot deadman pedal or second deadman pedal under the left foot could have made a difference here, you would need more data to know whether it would have? A. That's correct."); *id.* at 32:18-33:5, 35:12-16 ("THE WITNESS: If the Raymond optional door[6] had been in place, I believe that it *may* have mitigated his leg going out. But, I can't say for sure whether or not that door *would* have prevented his

---

[5] On February 25, 2022, mere days from the deadline for this motion to be filed, Dr. Meyer authored a supplemental report. Among other things, this report identifies the Raymond optional spring-loaded rear guard as his preferred alternative design. This supplemental report is exceedingly late and Raymond will be filing a motion to strike this report. This same tactic, to file a late report in the hope that a negative *Daubert* ruling could be avoided, was undertaken by Dr. Meyer (and Mr. Warshauer) in a case against Raymond's principal competitor, Crown Equipment, in the case of *Vallee v. Crown Equipment*. This case was pending in the U.S. District Court for the Eastern District of Louisiana, Case No. 20-1571. In that case, Judge Vance granted Crown's motion to strike Dr. Meyer's late report and then granted Crown's motion for summary judgment. Exhibit G, Order & Reasons entered 1/20/2022 in *Vallee v. Crown Equipment Corp. of Ohio* ("Ex. G"). Dr. Meyer offered essentially the same opinions in that case as here.

[6] Raymond makes available to customers an optional spring-loaded, rear operator guard for very limited environments of use such as lumber yards and pipe warehouses in order to keep these materials out of the compartment during slow maneuvering within an aisle. This option is not intended to keep operators in the truck. Moreover, Mr. Jones' employer turned down this feature when the truck was purchased.

7

injury." The optional rear guard offered by Raymond prevents intrusions into the operator compartment, but an operator can push it open from inside with the operator's foot.).

Dr. Kerrigan provided matter-of-fact testimony about the limitations of providing expert opinions, given the missing information. Dr. Meyer chose to ignore the lack of this information so that he could provide *ipse dixit* causation opinions.

D. **Dr. Meyer's Specific Alternative Design Opinions**

Dr. Meyer offers testimony on four alternative designs.

With respect to his door opinions, Dr. Meyer has not designed a door configuration. Ex. E at 100:14-19. He has never seen a forklift door physically, only in photographs and video. *Id.* at 102:9-12. He has not spoken with or done any survey of operators that use lift trucks with any type of rear operator door. *Id.* at 102:13-16. He has done no testing in this case. *Id.* at 30:2-4. Dr. Meyer admits that not a single manufacturer, ever, has manufactured a stand-up lift truck like the Model 4250 with a rear door as a standard feature. *See id.* at 113:9-114:13.

Plaintiffs may rely upon the existence of doors to excuse Dr. Meyer's minimal engineering work. Dr. Meyer references an existing door design – a door used by Newell Rubbermaid – but does not know if it complies with applicable safety standards such as those that require the door be able to withstand a certain level of force so it does not collapse into the operator's compartment. Ex. D at 108:24-109:20. There is no evidence in the record regarding the purpose of the door used by Newell Rubbermaid, or the safety and results of its use. Finally, Dr. Meyer has not selected a door design, but says if he had to pick one he would select the non-latching optional rear operator guard offered as optional equipment from Raymond. Ex. F at 122; *see also* footnote no. 5, *supra*. Raymond's optional rear guard is spring-loaded, and does not prevent an operator's foot from pushing the door open; it prevents intrusions into the operator compartment from outside. *See also* footnote, *supra*.

It is also a fact that in several recent cases in which Plaintiffs' counsel, Mr. Warshauer, has presented an expert offering the "rear door" alternative design opinion, all excluded these opinions based upon a full *Daubert* analysis (including three United States district court judges and one

8

U.S. Court of Appeals to date).[7] For example, in *Petersen v. Raymond,* Mr. Berry was precluded from testifying altogether, including his rear door opinion, and the district court decision was upheld on appeal. 994 F.3d 1224 (10th Cir. 2021).

With respect to Dr. Meyer's foot pedal opinions, Dr. Meyer wants a brake pedal under each foot. Ex. D at 90:12-15. He also offers the opinion that the Model 4250 should have a "Hyster-Yale Operator Sensing System," which has no pedals and instead utilizes only light lasers, which Dr. Meyer concedes have different settings but does not know if they can be turned off. Ex. F at 147; Ex. D at 90:12-23.

With respect to the backrest, Dr. Meyer opines there should be an operator presence sensing switch, and that such a feature "may" have prevented Mr. Jones' accident. Ex. F at 145-146. Mr. Jones testified that he did not recall if he was leaning against the backrest immediately before the accident, but that he did not always use the backrest. Exhibit J, Deposition Transcript of Rodney Jones taken 6/16/2021 ("Ex. J"), at 53:14-21.

With respect to the multifunction control handle, Dr. Meyer opines that the handle should be "designed so that it would not accelerate the forklift rearward" when an operator is pulling on the handle while exiting the operator compartment but like the door and pedal design opinions, Dr. Meyer performed no analysis to demonstrate that a different control handle design would have prevented Mr. Jones' accident other than his say-so that it would "lower the risk" of similar injuries to Mr. Jones'. Ex. F at 147.

The same is true for his other design opinions. He has offered mere *ipse dixit* and he has performed no actual design work. There is no analysis to present to the Court or the jury. Most importantly, he has not done any work to prove the issue of causation, i.e., if the changes he proposes had been in place, Mr. Jones' injuries ***would have*** been prevented.

---

[7] In addition, in *Anderson v. Raymond,* Dr. Meyer was precluded by the U.S. District Court for the Southern District of Illinois from offering the rear door opinion after full *Daubert* briefing and argument. (*See* Exhibit I, Order entered 7/27/2021 in *Anderson v. Raymond* ("Ex. I"), at 7. More recently, in *Vallee v. Crown*, Dr. Meyer offered essentially the same opinions offered here, and was precluded by the U.S. District Court for the Eastern District of Louisiana from testifying in the post-verdict motion phase.

9

## **RULE 702 AND *DAUBERT* STANDARD**

Expert testimony is admissible under Rule 702 if: (1) the expert testimony is helpful to the trier of fact in understanding the evidence or determining a fact in issue, (2) the expert is qualified to testify regarding the matters addressed, and (3) the proposed evidence is the product of reliable principles and methods. Fed. R. Evid. 702. The party who presents an expert witness has the burden of proving each of these elements to establish the admissibility of the expert's testimony by a preponderance of the evidence. Fed. R. Evid. 702; *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-460 (5th Cir. 2002).

Under Rule 702 and *Daubert*, federal courts serve as "gatekeep[ers]" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). These requirements apply to all "technical" or "other specialized" testimony, not just scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The Court's gatekeeping function is necessary since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (internal quotations omitted).

Expert testimony is admissible only if (a) it is based on sufficient facts or data; (b) it is the product of reliable principles and methods; and (c) the witness has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The trial court is afforded discretion in determining the reliability of expert testimony. *Kumho Tire Co.*, 526 U.S. at 152. The trial court must assess each step in the analysis underlying the expert witness' proposed testimony for reliability: methodology, facts underlying the expert's opinion, the link between underlying facts and the conclusion, and the conclusion itself. *Daubert*, 509 U.S. at 592-593 (1993). The method of determining reliability is within the discretion of the district court. *Kumho Tire Co.*, 526 U.S. at 152. Though the court may hold an evidentiary hearing, nothing requires it to do so and it may base a decision to exclude proffered expert testimony on discovery materials. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2317 (2016).

Courts look to a variety of factors to determine whether the expert applied reliable principles and methods, including the five factors laid out in *Daubert*: (a) whether the theory or technique can be or has been tested; (b) whether the theory or technique has been published and subjected to peer review; (c) the known or potential rate of error in the technique; (d) the existence of standards and controls and whether the witness applied those standards and controls; and (e) whether the theory or technique is generally accepted in the scientific community or relevant community of experts. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-594; *see also Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 n.17 (5th Cir. 2016). The ultimate goal of the court's reliability inquiry is assuring that proffered expert testimony is relevant and reliable from an evidentiary standpoint. *Kumho Tire Co.*, 526 U.S. at 152.

## ARGUMENT

**I.     DR. MEYER IS NOT QUALIFIED TO OFFER LIFT TRUCK DESIGN OPINIONS**

The proponent of expert testimony must demonstrate that the proffered expert is "qualified by knowledge, skill, experience, training, or education" to offer his opinions. Fed. R. Evid. 702. A witness cannot testify as an expert when they lack qualifications in the field or subject on which they are opining. *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016); *U.S. v. Haines*, 803 F.3d 713, 724 (5th Cir. 2015); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). An expert may not testify on matters that extend beyond their demonstrated expertise. *Haines*, 803 F.3d at 724; *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009).

Although Dr. Meyer is a mechanical engineer, he lacks any relevant experience, education, or training related to the design or operation of stand-up lift trucks. As explained above, Dr. Meyer has virtually no experience with stand-up lift trucks or their design and spent no professional time on those issues until he was engaged as a litigation expert by Plaintiffs' counsel about two years ago. Ex. D at 93:21-94:17, 116:17-117:1; Ex. E at 27:15-18, 25:25-26:6, 25:11-24, 20:15-21:13, 26:18-20; Ex. C. In short, other than being a mechanical engineer and "skimming" thousands of pages of other "experts'" litigation files and reports, Dr. Meyer has no relevant experience to qualify him as a ***design*** expert for stand-up lift trucks such as the Model 4250.

When considering the complexity of the design of a Model 4250 lift truck, and the complicated design issues raised by Dr. Meyer's "defect" opinions (e.g. whether a lift truck should have a door despite other known operational hazards), Dr. Meyer's lack of sufficiently relevant experience, education, and training related to stand-up lift trucks is critical and cannot be ignored. Because Dr. Meyer lacks specialized expertise of this complex machine, he is not qualified to render his design opinions and should be precluded from doing so at trial.

## II. DR. MEYER'S METHODOLOGY, OR LACK THEREOF, RENDERS ALL OF HIS OPINIONS UNRELIABLE

### A. Dr. Meyer's Design Opinions Must Be Excluded as Unreliable Because He Did Not Employ Any Engineering Methodology

Dr. Meyer's design opinions are unreliable because, by his own admission, he did not apply the *engineering methodology*.

The trial court's gatekeeping function requires more than simply "taking the expert's word for it." Fed. R. Evid. 702 advisory committee notes (2000). The proponent of expert testimony must show that the testimony is based on "sufficient facts or data," that it is "the product of reliable principles and methods," and that those methods have been "reliably" applied to the "facts of the case." Fed. R. Evid. 702 and advisory committee's note (2000); *Daubert*, 509 U.S. at 592-93. Even if the court finds that a witness is a "supremely qualified expert," that witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable ..." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 886 (E.D. Wis. 2010) (*quoting Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). Under Rule 702 and *Daubert*, "***any*** step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Where there is "simply too great an analytical gap between the data and the opinion proffered," the expert's opinion must be excluded. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). An expert must provide more than his own conclusory testimony to survive *Daubert* scrutiny. *Sims*, 839 F.3d at 407. "An expert who supplies nothing but a bottom line supplies

nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989); *see also Caraker v. Sandoz Pharmaceuticals Corp.*, 188 F.Supp.2d 1026, 1030 (S.D. Ill. 2001) (Where an expert fails to demonstrate that a particular opinion is more than a mere subjective belief, unsupported speculation, or a bald conclusion, the opinion is subject to exclusion under Rule 702).

The Fifth Circuit has addressed the exclusion of expert testimony in a similar context – where there is insufficient scientific support for an expert's alternative design causation opinions. In *Sims*, the Fifth Circuit affirmed the district court's entire exclusion of a design expert's proffered testimony regarding two alternative design opinions because the witness lacked a reliable basis to support the causation opinions. 839 F.3d at 408-409. The case was a product liability action involving allegations arising from a ruptured fuel tank in an automobile. *Id.* at 397. The plaintiffs attempted to support their claims with an expert who had not even performed mathematical or scientific analysis to support his conclusory opinions that two proposed alternative designs would have prevented the fuel tank from rupturing. *Id.* at 407. The Court explained (applying Texas law which, like Mississippi law requires an alternative design that would prevent or significantly reduce the risk of the subject injury): an alternative design must be "tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury," and that "testing need not entail actually constructing a model [alternative design]; testing can be as simple as applying math and physics to establish the viability of a design." *Id.* The expert in *Sims* failed to engage in even that simple testing, rendering his opinions that the alternative design would have made a difference in the accident conclusory and unreliable. *Id.*

In relevant part to this Motion, Mississippi law requires plaintiffs seeking to recover damages caused by a design defect to prove the existence of a feasible alternative design, defined as: "a design that ***would have to a reasonable probability prevented the harm*** without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code. § 11-1-63(f)(ii).

Here, it is clear from his own testimony that Dr. Meyer has engaged in none of the engineering methodology steps other than a concept because he has designed nothing. Like the witness in *Sims*, Dr. Meyer's causation opinions are nothing but his own speculation that are properly excluded as unreliable; said differently, Dr. Meyer's own *ipse dixit*. For example, Dr. Meyer alluded to analysis he allegedly performed with respect to the pedal, but failed to produce or show this analysis. Ex. D at 37:12-38:20, 35:2-36:17] But Dr. Meyer lacks the crucial data that would actually allow him to perform an analysis as to whether the subject lift truck would have stopped before impacting the rack during Mr. Jones' accident with any of his preferred alternative designs. Ex. D at 32:19-33:3, 33:1-7, 34:24-35:1. Just because Dr. Meyer says it does not make it true.

Instead of engaging in a real engineering methodology, Dr. Meyer has purportedly read a lot of materials – tens of thousands of pages of materials. This includes, in large part, litigation files of prior experts that are not attempting to offer any testimony in this case. As noted *supra,* the U.S. District Court for the District of Utah recently excluded one of the experts upon which Dr. Meyer relies for this very reason – all he did was read and "consider" material. In the case captioned *Petersen v. Raymond*, the court excluded Mr. Berry stating:

> At best, as Petersen's counsel repeatedly urges, and as testimony of the *Daubert* hearing revealed, [Mr. Berry] has quote, "considered," end quote, these alternatives and believes that each would have prevented Petersen's specific injury. **But merely stating he has considered various designs and how they might have guarded against Petersen's specific type of collision hazard, falls far short of any engineering rigor. Among other things, Berry fails to say how he considered them, fails to identify any scientific or technical analysis he applied to each, or any of them, and offers no scientific support for his naked conclusion that each or any of them is safer than the Raymond design.**

Exhibit K, Court's Ruling dated 1/21/2020 in *Petersen v. Raymond*, United States District Court for the District of Utah Central Division Case No. 2:14-CV-00894 ("Ex. K"), at 59:4-17 (emphasis added).

Without a showing that Dr. Meyer has engaged in an engineering methodology accepted in his field, his opinions are nothing more than rote speculation and must be excluded as unreliable. Plaintiffs bear the burden in response to demonstrate each and every one of Dr. Meyer's alternative

designs would have made a difference in order to reach the jury. They will be unable to do so because Dr. Meyer's opinions are merely impermissible *ipse dixit*.

Dr. Meyer's alternative design opinions fail *Daubert* scrutiny.

### III. DR. MEYER'S DOOR OPINIONS ARE UNRELIABLE BECAUSE THEY ARE UNIVERSALLY REJECTED BY THE RELEVANT SCIENTIFIC COMMUNITY

In addition to the dispositive reliability issues addressed above, Dr. Meyer's door opinions suffer from another fatal problem. Courts across the country have previously been presented the opportunity to evaluate this case-critical substantive opinion offered by Dr. Meyer that stand-up, counterbalanced lift trucks are defective if they do not have a rear door to enclose the operator compartment. This opinion has been found unreliable and been excluded on multiple occasions. *See, e.g., Lawrence v. Raymond Corp.*, 501 Fed. Appx. 515, 518 (6th Cir. 2012) (affirming *Lawrence v. Raymond Corp.*, 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011)); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417, at *6 (N.D. Ohio July 1, 2010), *aff'd* 676 F.3d 521, 528-29 (6th Cir. 2012); *Brown v. Raymond Corp.*, 318 F. Supp. 2d 591, 599 (W.D. Tenn. 2004), *aff'd* 432 F.3d 640, 646 (6th Cir. 2005) (*citing Dancy v. Hyster Company*, 127 F.3d 649 (8th Cir. 1997)); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869-70 (7th Cir. 2001); *see also* Ex. K at 59:4-17. Moreover, within the last six months, Dr. Meyer has been precluded from offering the rear door opinion by two other district court judges. (*See* footnote 5, supra.)

As another example, Mr. Berry, retained and proffered by Mr. Warshauer to offer identical opinions to Dr. Meyer, and whose materials Dr. Meyer has relied upon here, has been previously excluded by sister jurisdictions.[8] In addition to *Petersen v. Raymond*, in *Lawrence*, the United States District Court for the Northern District of Ohio evaluated Mr. Berry's opinions under the same standard applied here. 2011 WL 3418324, at *8. It rejected Mr. Berry's that the stand-up, counterbalanced lift truck at issue in that case, was defectively designed because it lacked a

---

[8] Even in the cases in which Plaintiffs' counsel was able to persuade trial judges to permit door opinions to be presented to the jury, the jury returned verdicts all in favor of either Raymond or Crown. In other words, these door opinion have either been excluded pretrial or rejected by jurors at the end of a trial. Given Dr. Meyer's lack of any experience with lift truck design or testing, this Court should not waste its precious trial time in this instance.

latching rear door.  This was because: (a) an industry group (ANSI)[9] which propounds standards applicable to the subject lift truck repeatedly voted against requiring a latching rear door; and (b) *"no manufacturer offers standard rear doors, let alone a latching door."*  *Id.*  The court then concluded that Mr. Berry's "theory and method application has been consistently rejected by the community of stand-up lift truck designers."  *Id.*  In sum, the district court excluded Mr. Berry's opinions as *ipse dixit*, unsupported by evidence, and unreliable, and the Sixth Circuit Court of Appeals affirmed.  501 Fed. App'x 515.

Here, Dr. Meyer seeks to offer the same opinion: that the subject lift truck is defective because it lacks a door as standard equipment.  *Lawrence* recognized this is universally rejected in the relevant scientific community (the lift truck industry).

Finally, the ANSI B56.1 Safety Standard specifically requires that lift trucks such as the Model 4250 be designed with open operator compartments.  *See* Raymond's *Brief in Support of Motion for Partial Summary Judgment on Plaintiffs' Claim for Punitive Damages* at 15, filed contemporaneously with this Motion.  Dr. Meyer has no real answer for the fundamental inconsistency between this requirement in the safety standard and his *ipse dixit* opinion.

## IV. DR. MEYER MAY NOT BE USED SIMPLY AS A MOUTHPIECE FOR MR. BERRY AND OTHERS

"[W]hile Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion."  *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005), amended, No. 01 C 9389, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005) (citing *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th

---

[9] The ANSI B56.1 Safety Standard committee is comprised of a diverse group of experts who design, purchase or utilize lift trucks.  It is a balanced committee with only one-third of its membership including representatives of manufacturing.  The other two-thirds include users and independent persons who have experience with lift trucks.  Dr. Meyer has never been a member of this committee and never attended a meeting of this committee even though meetings are open to the public.

16

Cir.2002); *TK-7 Corp. v. The Estate of Barbouti*, 993 F.2d 722, 731-34 (10th Cir.1993); *In re: James Wilson Associates*, 965 F.2d 160, 173 (7th Cir.1992).

Dr. Meyer is simply parroting the defect opinions of other purported experts, including Mr. Berry, John Sevart (Mr. Berry's boss), and Dr. Colton. In 2001, the Seventh Circuit affirmed exclusion of Mr. Sevart's testimony on this subject. *Dhillon v. Crown Controls Corp.* (*Dhillon II*), 269 F.3d 865 (7th Cir. 2001). The district court granted summary judgment to the defendant forklift manufacturer after precluding testimony from Mr. Sevart and the other "door" expert because these purported experts failed to "employ[] a sufficient scientific methodology in reaching or testing their conclusion regarding the particular forklift truck incident at hand." *Dhillon v. Crown Controls Cop.* (*Dhillon I*), No. 99 C 4428, 2000 WL 520747, at *2 (N.D. Ill. Mar. 14, 2000). The Court stated: "Plaintiff has not indicated to the court the place in the record where Mr. Sevart offers a sufficiently reliable scientific methodology in reaching his conclusions." *Id.* at *4. The Seventh Circuit affirmed, stating:

> We could identify a number of problems with the testimony [Mr. Sevart and the other expert] were prepared to offer, but the most glaring among them is the lack of testing, or more generally the failure to take any steps that would show professional rigor in the assessment of the alternative designs . . . . Although both experts wanted to assert that the truck design was defective because it did not include a rear door, neither expert has actually designed a model of a forklift truck with a rear door. Nor has either performed any tests of such a model to see if it is . . . just as safe or safer than the model without the door.

*Dhillon II*, 269 F.3d at 869-70. The Seventh Circuit further explained:

> Neither Sevart nor [the other expert] has provided any evidence that the rear door proposal has been favorably subject to peer review or generally accepted in the relevant communities. The plaintiff could not point to even one forklift manufacturer that has installed rear doors for general application or even one regulatory body or standards organization that requires or recommends a rear door on forklift stand-up trucks.

*Id.* at 870-71.

Other Courts repeatedly reached the same conclusions about these door-related defect opinions. *Tannenbaum v. Yale Materials Handling Corp.*, 38 F.Supp.2d 425, 432-35 (D. Maryland 1999) (excluding Mr. Sevart's door theory testimony as "farfetched and 'non-scientific'"); *Lawrence v. Raymond Corp.*, 501 Fed. Appx. 515, 518 (6th Cir. 2012) (affirming *Lawrence v.*

17

*Raymond Corp.*, 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011)) (Berry's opinion "had not been tested and was not at all accepted in the relevant scientific community"); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417, at *6 (N.D. Ohio July 1, 2010), *aff'd* 676 F.3d 521, 528-29 (6th Cir. 2012) (door opinion by Ben Railsback lack "professional rigor" and made "virtually unfounded declarations"); *Brown v. Raymond Corp.*, 318 F.Supp.2d 591, 599 (W.D. Tenn. 2004), *aff'd* 432 F.3d 640, 646 (6th Cir. 2005) (*citing Dancy v. Hyster Company*, 127 F.3d 649 (8th Cir. 1997)) (excluding open-back defect theory because the "theory was testable but had not been tested").

*Petersen v. Raymond* resulted in Mr. Berry's door opinions being excluded as unreliable because he offered "no scientific support for his naked conclusion that each or *any* of [the multiple door designs Berry described] is safer than the Raymond design." Ex. K at 59:4-17. Moreover, unlike Dr. Meyer, Mr. Berry has been involved with the issue of lift truck design for over 30 years. He even sat as an alternate on the B56.1 Safety Standard and attended meetings for Mr. Sevart. Dr. Meyer does not have any comparable experience. If Mr. Berry and Mr. Sevart were precluded from testifying, all the more so for Dr. Meyer.

Dr. Meyer has testified he was provided thousands of pages of litigation files from other purported experts that have been retained by Plaintiffs' counsel in past cases. *See* Ex. E at 112:21-117:12, 124:20-131:14, 133:7-136:15. This includes a significant volume of materials from Mr. Berry who has previously been precluded from testifying as recently as 2020 because he had not done the engineering work to support his "naked conclusion." *See id.*; *see also* Ex. K at 59:4-17. Allowing Dr. Meyer to be Mr. Berry's and others' mouthpiece, for unreliable testimony that has repeatedly been excluded as not being the product of a reliable engineering methodology, does not pass *Daubert* muster.

## CONCLUSION

For all the foregoing reasons, Raymond respectfully requests the Court enter an order precluding Dr. John Meyer from testifying in this matter.

18

Respectfully submitted, this the 4th day of March, 2022.

                THE RAYMOND CORPORATION
                By and through its attorneys,

                *s/ Francis H. LoCoco*
                Francis H. LoCoco (*Pro Hac Vice*)
                Margaret K. Heitkamp (*Pro Hac Vice*)
                HUSCH BLACKWELL LLP
                511 North Broadway, Suite 1100
                Milwaukee, Wisconsin 53202-3819
                (414) 273-2100 Telephone
                (414) 223-5000 Facsimile
                frank.lococo@huschblackwell.com
                margaret.heitkamp@huschblackwell.com

                *With Permission*
                *s/ Jacob B. Jordan*
                Jacob B. Jordan (MSB#104230)
                J. Rhea Tannehill, Jr. (MSB#10449)
                TANNEHILL, CARMEAN & MCKENZIE, PLLC
                829 Lamar Blvd, Suite 1
                Oxford, MS 38655
                (662) 337-7868 Telephone
                (662) 234-3949 Facsimile
                jacob@tannehillcarmean.com
                jrt@tannehillcarmean.com

                J. Banks Sewell (*Pro Hac Vice*)
                Rachel M. Lary (MSB#105794)
                LIGHTFOOT, FRANKLIN & WHITE
                400 20th St. N.
                Birmingham, Alabama 35203
                (205) 581-1511 Telephone
                bsewell@lightfootlaw.com
                rlary@lightfootlaw.com

## **CERTIFICATE OF SERVICE**

  I hereby certify that on March 4, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the follow to the following:

MERKEL & COCKE, P.A.
Charles M. Merkel, Jr.
Edward P. Connell, Jr.
Yeager M. Bass
P.O. Box 1388
Clarksdale, MS 38614
(662) 627-9641 Telephone
(662) 627-3592 Facsimile
tconnell@merkel-cocke.com
cmerkel@merkel-cocke.com

*Attorneys for the Plaintiffs*

WARSHAUER LAW GROUP, P.C.
Michael J. Warshauer
Jasper Abbott
2740 Bert Adams Road
Atlanta, Georgia 30339
(404) 649-5373 Telephone
mjw@warlawgroup.com
jasper@warlawgroup.com

*Attorneys for the Plaintiffs*

MARKOW WALKER, P.A.
Courtney E. McAlexander
J. Henry Jones, IV
Post Office Drawer 50
Oxford, MS 38655
(662) 234-9899 Telephone
(662) 234-9762 Facsimile
cmcalexander@markowwalker.com
hjones@markowwalker.com

*Attorneys for New Hampshire Insurance Company*
*c/o Sedgwick Claim Management Services*

  Dated this the 4th day of March, 2022.

                *s/ Francis H. LoCoco*