UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAWSON VALLEE                                        CIVIL ACTION

VERSUS                                                  NO. 20-1571

CROWN EQUIPMENT CORP. OF                 SECTION "R" (4)
OHIO, ET AL.


**<u>ORDER AND REASONS</u>**

Before the Court is defendant Crown Equipment Corporation's
("Crown") motion for summary judgment on plaintiff Dawson Vallee's claim
that a Crown forklift was defectively designed under the Louisiana Products
Liability Act.[1]  Plaintiff opposes the motion.[2]  Because plaintiff is unable to
meet his burden on his design-defect claim, the Court grants Crown's
motion, and dismisses the claim.


## I.      BACKGROUND

This case arises out of a forklift accident in Harahan, Louisiana.[3]  On
the date of the accident, plaintiff Dawson Vallee was working for intervenor
Republic National Distributing Company ("Republic"), and was operating a

---

[1]     R. Doc. 112.
[2]     R. Doc. 142.
[3]     R. Doc. 1-2 ¶ II.

EXHIBIT 1

forklift designed and manufactured by defendant Crown.  The forklift was a
Crown RM6000 stand-up lift truck.  The operator drives the truck by
standing sideways and leaning back against a backrest.[4]  The forks are
located to the user's right, and the operator compartment is open to the
exterior on the user's left.[5]  The truck does not have a door.[6]  The driver can
slow down or stop the truck by pulling backwards on the multitask handle (a
method known as "plugging"),[7] or by using the truck's foot-pedal system.
When the driver's left foot is pushed down on the brake pedal, the brake is
off, and the truck can move.[8]  To apply the brake, the driver lifts his heel or
moves his foot off the pedal.[9]

Near the end of plaintiff's shift on May 3, 2019, plaintiff stepped onto
the forklift, and began to drive it to its usual storage location.  Plaintiff
testified that, "[a]s soon as [he] took off," the joystick on the forklift stopped
responding, and he lost control of the machinery.[10]  He testified that he first
attempted to stop the machine by plugging it, but that it did not work.[11]  He

---

4       R. Doc. 112-3 at 6 (Crown Operator Manual).
5       *See id.*
6       *Id.*
7       *Id.* at 14.
8       *Id.* at 13.
9       *Id.*
10      R. Doc. 142-4 at 63-64 (Vallee Deposition at 63:23-64:1).
11      *Id.* at 65-66 (Vallee Deposition at 65:22-66:14).

then attempted to stop the truck by lifting his left foot off the brake pedal, but the machine still did not stop.[12]  Plaintiff explained that, at that point, the forklift "jerked [him] around,"[13] and "tossed [his] leg around the outside of the machine."[14]  The forklift collided with a pole, and plaintiff's left leg was crushed between the pole and the forklift.[15]  As a result of the accident, plaintiff underwent a below-the-knee amputation of his left leg.[16]

On May 1, 2020, plaintiff filed suit against Crown[17] in Louisiana state court, alleging defective design and manufacture of the forklift, and negligent maintenance, inspection, and repair of the forklift.[18]  On May 29, 2020, Crown removed the case to federal court, contending that the diversity requirements of 28 U.S.C. § 1332 were satisfied.[19]  At this stage, only the design-defect claim against Crown remains.[20]

---

[12]  *Id.* at 64, 66 (Vallee Deposition at 64:3-7; 66:13-14).

[13]  *Id.* at 64 (Vallee Deposition at 64:7-8).

[14]  *Id.* at 65 (Vallee Deposition at 65:5).

[15]  *Id.* at 64 (Vallee Deposition at 64:9-11).

[16]  *Id.* at 82-83 (Vallee Deposition at 82:16-83:3); R. Doc. 1-1 at 3 ¶ VI.a.

[17]  Plaintiff also sued individual employee-defendants George Bordelon and Adam Giroir, but plaintiff's claims against both Bordelon and Giroir have been dismissed.  R. Docs. 15 & 32.  Only Crown remains as a defendant.

[18]  R. Doc. 1-1 at 2-3 ¶ III.

[19]  R. Doc. 1 at 1.

[20]  *See* R. Doc. 190 at 3-4 (Joint Pretrial Order).

On October 20, 2021, Crown moved for summary judgment on plaintiff's design-defect claim.[21]  Crown contends that plaintiff's design experts have failed to identify a specific alternative design that can satisfy the elements of the Louisiana Products Liability Act.[22]  Plaintiff opposes the motion, arguing that his experts have submitted multiple alternative designs, each of which are sufficient to meet his burden on defective design.[23]

The Court considers the parties' arguments below.

## II.  LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are

---

[21]  R. Doc. 112.
[22]  R. Doc. 112-1 at 2-4.
[23]  R. Doc. 142 at 8-24.

drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III.  DISCUSSION

### A.  Defective Design Standard

The Louisiana Products Liability Act ("LPLA") provides for "the exclusive theories of liability for manufacturers for damage caused by their products." La. Rev. Stat. § 9:2800.52; *see also Brown v. R.J. Reynolds*

*Tobacco Co.*, 52 F.3d 524, 526 (5th Cir. 1995) (noting that the LPLA's remedies are "exclusive"). Under the LPLA,

> [a] product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
>
> (1)   There existed an alternative design for the product that was capable of preventing the claimant's damage; and
>
> (2)   The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

La. Rev. Stat. § 9:2800.56. In all but the simplest cases, design-defect claims require the submission of expert testimony. *Stewart v. Cap. Safety USA*, 867 F.3d 517, 521 (5th Cir. 2017) (collecting cases).

Here, plaintiff has submitted reports from multiple experts to support his claim that Crown's forklift was defectively designed. Taken together, his experts submit three alternative designs that they contend would have prevented or mitigated plaintiff's injuries: (1) the addition of a door on the forklift's operator compartment, (2) a reconfiguration of the forklift's foot-pedal braking system, and (3) a sensor on the forklift's backrest. If none of

these designs, as submitted by plaintiff's experts, satisfy plaintiff's burden under the LPLA, then Crown is entitled to summary judgment dismissing plaintiff's design-defect claim.

### B. Untimely Affidavit of John Meyer

Before proceeding to the substance of plaintiff's proposed designs, the Court notes that, as part of plaintiff's opposition to Crown's motion for summary judgment, plaintiff has submitted a ten-page supplemental affidavit by one of his design experts, John Meyer.[24] The affidavit directly responds to arguments that Crown makes in its motion for summary judgment[25] and its *Daubert* motion to exclude Meyer's testimony.[26] The affidavit contains substantive opinions not submitted in Meyer's original report, including the "endorse[ment]" of a "representative specific door design" for the forklift, and specifications associated with that design.[27] In seeking to defeat summary judgment, plaintiff relies heavily on Meyer's affidavit.[28]

---

[24]  R. Doc. 142-12 (Meyer Affidavit).

[25]  R. Doc. 112.

[26]  R. Doc. 115.

[27]  R. Doc. 142-12 ¶ 9 (Meyer Affidavit).

[28]  *See, e.g.*, R. Doc. 142 at 13-14 (quoting in full two substantive paragraphs of Meyer's affidavit, and contending that, accordingly,

This supplemental affidavit is untimely under the Court's scheduling order. The affidavit is dated October 29, 2021,[29] over six months after plaintiff's April 9, 2021 deadline for expert disclosures.[30] Plaintiff has not asked the Court for an extension or modification of this deadline, much less shown good cause for the Court to do so over six months after the deadline's expiration. *See* Fed. R. Civ. P. 16(b)(4); *see also Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc.*, No. 97-1609, 1999 WL 135297, at *3 (E.D. La. Mar. 11, 1999) (excluding a supplemental expert report submitted "substantially past [the] cut-off date for the exchange of [plaintiff's] expert reports").

To assess whether to strike plaintiff's untimely expert affidavit, the Court considers four factors: (1) the explanation for the delay, (2) the importance of the testimony, (3) the potential prejudice in allowing the testimony, and (4) the availability of a continuance to cure such prejudice. *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

As to the first factor, plaintiff offers no explanation whatsoever for the untimeliness of his supplement. Indeed, plaintiff does not even mention in his opposition brief that the affidavit is late, much less account for the

---

"plaintiff has offered a specific alternative design notwithstanding the argument by Crown that they have not.").

[29] R. Doc. 142-12 at 10 (Meyer Affidavit).

[30] *See* R. Doc. 17 at 2 (Scheduling Order).

troubling fact that the affidavit was produced only *after* defendant filed its dispositive motions, including three motions for summary judgment. Plaintiff's lack of explanation for his last-minute supplementation strongly favors striking the affidavit.

As to the second factor, the testimony contained in the affidavit is important. It seeks to remedy the deficiencies identified by Crown in Meyer's original expert report, and demonstrate an issue of material fact sufficient to survive summary-judgment dismissal of plaintiff's design-defect claim. While the importance of the testimony tends to favor admission of the affidavit, the Fifth Circuit has explained that this importance also "underscores the need for [p]laintiffs to have complied with the court's deadlines." *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 381 (5th Cir.1996). And in any case, "the importance of [the] proposed testimony cannot singularly override the enforcement of local rules and scheduling orders." *Id.* (citing *Geiserman*, 893 F.2d at 792).

As to the third factor, admission of the untimely testimony would be highly prejudicial to Crown. The motions to which the affidavit responds are premised entirely on the insufficiency of the original (and timely) expert reports. To allow plaintiff an attempt at correcting the report's shortcomings—which were identified and thoroughly briefed by defendant—

would be fundamentally unfair and lead to perverse consequences. The prejudice factor strongly favors striking the affidavit.

Finally, as to the fourth *Geiserman* factor, a continuance is not available to cure the prejudice. As discussed, this affidavit emerged only after both parties had filed their dispositive motions. Reopening the expired deadlines would only further prolong this case, which has been continued twice already.[31] And in any case, plaintiff does not seek a continuance as a means of accommodating his untimely supplement.

For these reasons, the Court strikes the untimely affidavit of John Meyer.[32] This ruling is consistent with Fifth Circuit precedent indicating that litigants are not entitled to "second chance[s]" at proving their case by way of supplemental expert reports. *Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 257-58 (5th Cir. 1997) ("District judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case."); *AIG Eur., Ltd. v. Caterpillar, Inc.*, 831 F. App'x 111, 116 (5th Cir. 2020) (affirming the district court's exclusion of plaintiff's untimely supplemental expert report on causation); *see also Elliot v. Amadas Indus., Inc.*, 796 F. Supp. 2d 796, 805 (S.D. Miss. 2011) (striking the

---

[31]     R. Docs. 75 & 104.

[32]     R. Doc. 142-12 (Meyer Affidavit).

untimely supplemental report of plaintiff's expert in a Mississippi products-liability case); *Cleave v. Renal Care Grp., Inc.*, No. 04-161, 2005 WL 1629750, at *1 (N.D. Miss. July 11, 2005) ("A new expert affidavit which is submitted to rebut a summary judgment motion should be stricken if the new opinions differ from the earlier Rule 26 report.").

Meyer's affidavit is thus struck from the record. The Court confines its analysis of plaintiff's expert design-defect evidence to the timely submitted reports of John Meyer[33] and Richard Ziernicki.[34]

### C.    Addition of a Door

The primary alternative design submitted by plaintiff's experts is the addition of a door to the operator compartment of the forklift. Crown contends that this idea is merely a "concept," and that plaintiff has failed to

---

[33]    R. Doc. 142-11 (Meyer Report).

[34]    R. Doc. 142-14 (Ziernicki Report). Plaintiff also submitted an expert report by Jason Kerrigan. The report contains statements that might be construed as design opinions, including the assertion that "[a] physical door eliminates the chance that a forklift operator could place any of their limbs outside . . . the forklift." R. Doc. 112-9 at 12 (Kerrigan Report). But plaintiff does not at all rely on Kerrigan's opinions in opposing summary judgment. Kerrigan's name appears nowhere in his brief. Plaintiff contends only that the opinions of Meyer and Ziernicki defeat Crown's motion. The Court therefore does not, in ruling on this motion for summary judgment, *sua sponte* parse Kerrigan's report in search of a sufficiently identified alternative design.

identify a *specific* alternative door design applicable to the Crown RM6000 forklift at issue here.[35]

The LPLA requires a design-defect claimant to show, using expert testimony, that at the time the product left the manufacturer's control, there was an alternative design for the product that could have prevented the claimant's damage, and that the benefits of that alternative design outweighed the costs of the design, and any loss of utility of the product. La. Rev. Stat. § 9:2800.56. Courts applying the LPLA have found expert design testimony insufficient when the proffered expert fails to identify and describe a specific alternative design, and explain how that design would apply to the product at issue. For instance, in *Seither v. Winnebago Industries, Inc.*, the Louisiana Fourth Circuit held that the trial court erred in not granting a directed verdict for the manufacturer, because the evidence presented at trial by plaintiff's design expert was insufficient to meet plaintiff's LPLA burden. 853 So. 2d 37, 41 (2003). There, the expert "presented a mock-up of a Dodge Ram van" as a design alternative to the RV design that purportedly caused the death of plaintiff's husband and son. But, the expert's "design criteria were not outlined[;] there were no engineering drawings produced[;] he did not establish any dimensions[;] and he had done no analysis or testing." *Id.*

---

[35]   R. Doc. 112-1 at 11-18.

Further, "he did not calculate or measure the amount of intrusion [in the event of a crash] that would have occurred even with his supposed design, thus defeating a claim that the alternative design would have prevented plaintiffs' injuries." *Id.* The Court further noted that the record was "devoid of any technical drawings, calculations, scientific study, photographs, or the publication of any engineering principles as to this proposed alternative design." *Id.* Because of these deficiencies, the Court found that plaintiff's expert had not "actually reduced his speculative concepts to writing." *Id.* Instead, he "presented merely a concept that was untested[] [and] unengineered." *Id.* Accordingly, "*there was no valid alternative design presented.*" *Id.* (emphasis added).

This Court reached a similar result in *Scordill v. Louisville Ladder Group, LLC*, No. 02-2565, 2003 WL 22427981 (E.D. La. Oct. 24, 2003). There, the Court found that plaintiff's expert had not articulated a specific alternative design for an allegedly defective ladder. *Id.* at *9. While the expert opined that a heavy-duty ladder was safer than the ladder at issue by virtue of "a stiffener, a boot, and a protective collar," he did not clarify how those features "would apply to the incident ladder model." *Id.* He also did not "identify how tall or strong such a boot would be or where on the ladder a stiffener or protective collar would be placed to prevent an accident like

[plaintiff]'s." *Id.* The Court granted summary judgment in favor of the ladder's manufacturer. *Id.* at *10.

The Court finds that plaintiff's expert evidence[36] in this case suffers from the same deficiencies. The most thorough of plaintiff's expert reports is that of John Meyer.[37] Meyer opines, in part, that "a safety door on the operator compartment" is a "reasonably available alternative design[]" that "would have virtually eliminated the risk of the injury suffered by Mr. Vallee."[38] But nowhere in his 129-page report does Meyer commit to, or provide any specifications for, any particular door design. Instead, he submits photographs of six door-bearing forklifts manufactured by Crown and by Crown's competitors,[39] described in sum as "[a] *variety* of stand-up

---

[36] Crown has separately moved to exclude the testimony of all of plaintiff's experts. R. Docs. 113, 115, 117 & 118. In ruling on this summary-judgment motion, the Court does not decide whether the testimony would ultimately be admissible, but instead determines whether, even if admitted, the evidence would enable plaintiff to meet his burden under the LPLA. *See First Unum Ins. Co. of Am. v. Rucker*, No. 20-181, 2021 WL 799318, at *2 (S.D. Tex. Jan. 25, 2021) (granting defendant's motion for summary judgment when plaintiff's evidence, "even if admissible, d[id] not establish a factual basis for" a contrary result); *see also Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 813 (6th Cir. 1994) (holding that plaintiffs' "expert testimony, assuming that it is admissible, is [in]sufficient to withstand summary judgment for [defendant]").

[37] R. Doc. 142-11 (Meyer Report).

[38] *Id.* at 1.

[39] *Id.* at 106-109.

forklifts displaying *a number of different door designs and features*."[40]
Meyer gives each of the six designs a one-sentence description and nothing
further. His report is "devoid of any technical drawings[] [or] calculations"
regarding these six designs, *Seither*, 853 So. 2d at 41, as well as any
indication of how the doors "would apply to the incident [forklift]." *Scordill*,
2003 WL 22427981, at *9; *cf. Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992
(5th Cir. 1997) ("[Plaintiff's design expert] did not even make any drawings
or perform any calculations that would allow a trier of fact to infer that his
theory that the [product's] design was defective and that alternative designs
would have prevented the accident without sacrificing utility were supported
by valid engineering principles." (applying Mississippi products-liability
law)). Meyer also offers no insight into the proposed composition of the
door, and instead merely states that "the door should be constructed out of a
suitable material that would withstand the forces of impact generated during
collisions, tipovers[,] and off-dock accidents."[41] The question of which
"suitable material" meets this standard is left to the imagination.

Moreover, the sheer variety among the six door types further muddies
the waters. Some of the depicted trucks have "a latching rear door," while

---

[40]    *Id.* at 105 (emphasis added).
[41]    *Id.* at 109.

others have a "spring closed" or "spring-loaded" door.[42]  Yet another has a

"magnetically controlled and interlocked door."[43]  Meyer does not vouch for

any one door design over another.  Nor does he explain whether or to what

extent the forklifts depicted are representative of Crown's RM6000 truck,

making it impossible to know whether the proffered door designs have any

application to the product at issue here.  Indeed, at least in terms of size and

shape, many of the depicted forklifts are visibly distinct from one another

and from the RM6000 on which plaintiff was injured.[44]  And despite

submitting a concededly wide range of truck types and door designs, Meyer

makes no attempt to explain whether or how these divergent features would

differ from one another as to key considerations under the LPLA, including

the cost of installing them, their impact on the forklift's utility, the extent to

which they could have been feasibly retrofitted onto the incident forklift, and

their ability to prevent or mitigate plaintiff's injuries.

This noncommittal approach to expert design opinions is a problem.

As the Fifth Circuit explained in *Guy v. Crown Equipment Corp.*, when

plaintiff's design experts do "not reach[] any concrete conclusions about the

*best* design alternative," and "never specif[y] which design [they] plan[] to

---

[42]    *Id.* at 105-106.
[43]    *Id.* at 106.
[44]    *See id.* at 106-109.

support at trial," the manufacturer is deprived of "sufficient opportunity, before trial, to prepare a reply to [the] proposed opinions." 394 F.3d 320, 327 (5th Cir. 2004). In a recent case very similar to this one, the Tenth Circuit favorably cited the Fifth Circuit's opinion in *Guy*, and affirmed the district court's grant of summary judgment for a forklift manufacturer, because "[p]laintiff's expert failed to commit to *any definitive* feasible design alternative," and instead "offered only sweeping opinions about doors in general." *Petersen v. Raymond Corp.*, 994 F.3d 1224, 1226, 1229 (10th Cir. 2021). Elaborating on the rationale for demanding commitment to a specific design, the court explained that "[a] jury cannot compare the existing design to, essentially, anything and everything." *Id.* at 1229. "By not committing, [p]laintiff's expert ma[kes] it impossible to compare the benefits and risks of any phantom design made of unknown materials, attached in unknown ways, with unknown safety and performance effects, at an unknown cost, to the [existing] design." *Id.* at 1230.

Here, because Meyer does not propose a specific alternative door design, he is unable to show that such a design could have prevented plaintiff's injuries, or that that the benefits of that design outweigh its costs, as required by the LPLA. *See* La. Rev. Stat. § 9:2800.56. Meyer did not, for instance, conduct any testing using a model door on a forklift identical to, or

representative of, the Crown RM6000, which might have shown that his alternative design was viable. Of course, such a test would have required Meyer to commit to a particular design with known specifications, which he has not done.

For these reasons, Meyer's expert opinions on the addition of a door do not create a sufficient evidentiary basis upon which a jury could find for the plaintiff on his LPLA design-defect claim.

The expert report of Richard Ziernicki fares no better. Like Meyer, Ziernicki fails to provide specifications for any particular door design, and refrains from committing to any of the multiple door designs mentioned throughout his 61-page report.[45] Indeed, Ziernicki equivocates as to whether it is even a door that he supports. He initially states that Crown should not have sold its standup lift truck to Republic at all, and instead "should have only offered [its] sit/stand version of the forklift," because the sit/stand truck offers "greater stability and safety" than the standup truck that plaintiff was using.[46] Ziernicki then states that, if Crown insisted on selling the standup truck, it "should have provided the forklift with a spring assisted or latching door, *or operator guard* as standard guarding equipment."[47] He asserts that

---

[45]    *See* R. Doc. 142-14 (Ziernicki Report).
[46]    *Id.* at 8.
[47]    *Id.* (emphasis added).

"[l]atching and spring loaded and even interlocked doors, or operator guards were all technologically and economically feasible."[48]  Ziernicki does not explain what an "operator guard" is, nor does he offer any drawings, measurements, or other specifications to substantiate this list of design ideas.

This non-specificity persists as Ziernicki chronicles Crown's "history with operator compartment guarding," and surveys door designs offered by Crown's competitors.  Ziernicki states that "Crown produced a 'gate' style door for the K-Mart Corporation," and later produced "a more substantial door for the Ford Motor Company."[49]  He includes a photograph bearing the caption, "Crown RR truck equipped with a 'Ford' door."[50]  He also includes two photographs of forklifts manufactured by Crown's competitor.[51]  Ziernicki conclusorily states that he "ha[s] evaluated the design of the door manufactured [by Crown] for Ford Motor Company and concluded that the door would be effective in preventing lower leg injuries."[52]  But like Meyer, Ziernicki fails to include any specifications regarding any of these designs, including the doors' dimensions, composition, and means of attachment to

---

[48]     *Id.*
[49]     *Id.* at 37.
[50]     *Id.* at 39.
[51]     *Id.* at 43-44.
[52]     *Id.* at 37.

the corresponding forklifts.  Furthermore, like Meyer, Ziernicki never selects any design from his assortment of doors as his preferred alternative design. His proposal may be a spring-loaded door, a latching door, a "gate" style door, or some unknown "operator guard" that is not a door at all.

Ziernicki too has failed to test or otherwise demonstrate the feasibility, costs, and benefits of any alternative door design.  To be sure, Ziernicki does explain that that he ran a test in 2014 using a Crown standup forklift, and a "rear occupant compartment guard door" manufactured by a competitor.[53] But Ziernicki cites this study only to show that the addition of a door does not significantly affect operator egress times.  He does not submit the door design used in his study as his alternative design for the Crown RM6000, nor does he provide any specifications regarding the door's dimensions, composition, or means of attachment to the forklift.

For all of these reasons, as to his door proposal, Ziernicki has failed to identify a specific alternative design capable of satisfying plaintiff's burden under the LPLA.  *See Seither*, 853 So. 2d at 41; *Scordill*, 2003 WL 22427981, at \*9; *Guy*, 394 F.3d at 327; *Watkins*, 121 F.3d at 992.

Plaintiff cites the opinions of only Meyer and Ziernicki in opposing Crown's motion for summary judgment.  For the reasons given above, these

---

[53]    *Id.* at 46.

expert materials are insufficient to withstand summary judgment on plaintiff's LPLA design-defect claims. *See Celotex*, 477 U.S. at 324-25. Accordingly, as to the proposed addition of a door to the operator compartment of the Crown RM6000, defendant is entitled to summary judgment dismissing plaintiff's design-defect claim.

### D.    Foot Pedal Modifications

The same problems plague plaintiff's experts' proposals that Crown modify the foot-pedal braking system on the Crown RM6000. Both Meyer and Ziernicki dedicate significantly less space to this idea compared to their door concepts, but the design essentially seeks to avoid situations where a user must lift his left foot to apply the brake.

But again, plaintiff's experts fail to commit to and provide specifications for any particular alternative design. Meyer first proposes a "reprogramming of the foot pedals on the floor of the Crown forklift."[54] He suggests swapping the existing pedals, so that the brake is applied by the right foot, rather than the left.[55] To explain this idea, he includes two diagrams of the *existing* foot-pedal design, with an arrow labeled "new brake

---

[54]    R. Doc. 142-11 at 122 (Meyer Report).

[55]    *Id.*

pedal location."[56] Meyer then concedes that, although he "ha[s] not . . . addressed any minimal changes in the shape and/or position of the pedals themselves, . . . one could expect that minor ergonomic adjustments could occur to maximize the effectiveness of the new pedal layout."[57] This rough sketch of a plausible reconfiguration of the forklift's foot pedals is merely a "speculative concept." *Seither*, 853 So. 2d at 41.

Meyer then identifies "[a]nother potential alternative design" of the foot pedals that he contends "deserves consideration as well."[58] To this end, he points to a pushdown brake used by Hyster-Yale, a different manufacturer.[59] But once again, Meyer does not commit to this design as his preferred alternative. Indeed, he commits to neither this nor the left/right pedal swap, and instead suggests that, so long as the forklift lacks a door, the machine would remain defective. Specifically, Meyer writes that he "believe[s] the addition of a door is *required* to achieve acceptable risk,"[60] and that floor-pedal modifications merely "*could . . . have* prevented Mr. Vallee's accident from occurring."[61] Meyer's equivocal account of possible

---

[56]   *Id*. at 123.
[57]   *Id*. at 123-124.
[58]   *Id*. at 124.
[59]   *Id*.
[60]   *Id*. at 122 (emphasis added).
[61]   *Id*. at 124 (emphasis added).

foot-pedal modifications does not sufficiently identify a specific alternative design under the LPLA.

Similarly, Ziernicki merely floats ideas on reconfiguring the foot pedals: he writes that he supports "[e]ither having the brake under both feet, with the operator trained to use the right foot, or having a pushdown brake with placement sensors to encourage proper operator positioning of both feet."[62] He does not cite any specific design as his preference, nor does he offer any specifications that might endow these concepts with substance.

Finally, the Court notes that neither Meyer nor Ziernicki have tested or otherwise demonstrated the feasibility of any of their foot-pedal ideas, all of which are merely conceptual. While one of the designs—Hyster-Yale's pushdown brake cited by Meyer—exists in the real world, Meyer submits no data on this design's safety record, much less any indication that it would have prevented plaintiff's injuries in this case. And more critically, Meyer has failed to show how this design, used by a different manufacturer on its own forklifts, would apply to Crown's RM6000.

For these reasons, a jury considering Meyer's and Ziernicki's foot-pedal ideas would be unable to properly assess whether the designs are feasible on the Crown RM6000, whether they would have prevented

---

[62]     R. Doc. 142-14 at 60-61 (Ziernicki Report).

plaintiff's injuries, and whether they prevail in a risk-utility analysis. Accordingly, as to the proposals to modify the foot-pedal braking system on the Crown RM6000, defendant is entitled to summary judgment dismissing plaintiff's design-defect claim.

### E.    Backrest Sensor

Finally, the Court finds that plaintiff's third design idea, the addition of a backrest sensor, is not a viable alternative design under the LPLA. Plaintiff's experts propose "the addition of a backrest presence sensor that detects when an operator is in t[he] normal position, . . . and ensures that the travel circuit is disconnected when this position is not maintained."[63]   In other words, if a user removes his back from the backrest, the truck stops. But here, the record establishes that plaintiff's back remained against the backrest during the incident.[64]   Accordingly, plaintiff is unable to show that any form of backrest sensor "was capable of preventing [his] damage."  La. Rev. Stat. § 9:2800.56(1).   Indeed, the parties' jointly submitted pretrial

---

[63]    R. Doc. 142-11 at 125 (Meyer Report); *see also* R. Doc. 142-14 at 37 (Ziernicki Report) (stating that "Crown does not have a safety system or sensor in the backrest area . . . which would disengage the travel circuit when the operator does not have their back against the back rest.").

[64]    R. Doc. 142-4 at 72 (Vallee Deposition at 72:12-14).

order indicates that plaintiff has abandoned this alternative design in advance of trial.[65]  The Court finds that Crown is entitled to summary judgment as to the backrest-sensor design.

### F.    Plaintiff's Arguments

Plaintiff's arguments in opposition to Crown's motion for summary judgment are without merit.  First, plaintiff urges a strict textual reading of the products-liability statute, and contends that the LPLA does not include the word "specific" or otherwise require plaintiff to submit a "specific" alternative design.[66]  While it is true that the statute does not use the word "specific," it clearly speaks in terms of a specific design alternative.  The statute provides that a product is unreasonably dangerous in design if (1) there existed an alternative design that could have prevented the injuries, and (2) the risks of the existing design "outweighed the burden on the manufacturer of adopting *the alternative design* and the adverse effect . . . of *such alternative design* on the utility of the product."  La. Rev. Stat. § 9:2800.56 (emphasis added).  The risk-utility analysis is therefore

---

[65]    R. Doc. 190 at 3-4 (Pretrial Order) (naming "*two* alternative designs for the forklift," including "a primary brake that keeps the left foot safely on the floor, and a safety door" (emphasis added)).

[66]    R. Doc. 142 at 7.

premised upon the claimant's identification of a particular design. Furthermore, even if the Court suspected that the text might accommodate a mere concept as a claimant's "alternative design," the Court sees no reason to depart from the decisions and reasoning of the multiple state and federal courts that have considered this issue.

Plaintiff's other arguments do not pertain to, and therefore do not remedy, his experts' failure to commit to, and provide detailed specifications for, a particular alternative design. For instance, he argues throughout his opposition brief that the addition of a door satisfies the LPLA's risk-utility analysis, because off-dock accidents are not possible at Republic's facility,[67] and because the addition of a door is low-cost, does not impact the utility of the forklift, and prevents left-leg injuries.[68] But because plaintiff's experts have not articulated a specific alternative design, these contentions are unmoored to any concrete reference points. The mere concept of a "door," with unknown qualities, is not susceptible to the cost-benefit analysis that the jury in this case would be tasked with performing.

Plaintiff also relies on case law to support his position. For example, he directs the Court to the Ninth Circuit's decision in *McEuin v. Crown*

---

[67]    *Id.* at 4-6.
[68]    *Id.* at 8-10; 17-24.

*Equipment Corp.*, 328 F.3d 1028 (9th Cir. 2003),[69] which arose from a jury trial in which Crown was found liable under Oregon law for a defectively designed forklift. There, as in this case, the plaintiff's defective-design theory was that the truck should have had a door. *Id.* at 1030. But apart from the fact that a particular jury, viewing a particular record, found Crown liable for its forklift's lack of a door, the case is neither here nor there. In the opinion cited by plaintiff, the Ninth Circuit merely affirms the district court's exclusion of Crown's evidence and the denial of Crown's motion for a new trial. *Id.* The sufficiency of plaintiff's design evidence was not at issue.

Plaintiff also cites multiple Louisiana cases to support his arguments. *See Holloway v. Midland Risk Ins. Co.*, 832 So. 2d 1004 (La. App. 2 Cir. 2002);[70] *Johnson v. T.L. James & Co., Inc.*, 809 So. 2d 287 (La. App. 1 Cir. 2001);[71] *Sandifer v. Hoyt Archery Inc.*, No. 12-322, 2015 WL 4429189 (M.D. La. July 20, 2015).[72] But these too fail to undermine Crown's motion for summary judgment. In none of these cases did the court consider whether the plaintiffs' design experts had sufficiently identified a design alternative. In *Holloway*, the plaintiff's design expert introduced a specific "bend

---

[69]     *Id.* at 3-4.
[70]     *Id.* at 10-12.
[71]     *Id.* at 15-16.
[72]     *Id.* at 12-13.

restrictor," in the form of a "flexible metal spiral device," at trial. 832 So. 2d at 1012. The specificity of the expert's proposed alternative design was not an issue. Nor was specificity or commitment an issue in *Johnson*, where the defendant-manufacturer did not challenge whether the expert had sufficiently identified an alternative design, but instead claimed that the chosen design would not have been "any more effective in th[e] situation" at issue. 809 So. 2d 291. And the court in *Sandifer* merely held, consistent with Fifth Circuit precedent, that there is no "bright line requirement that proffered alternative designs must be built and tested." 2015 WL 4429189, at *4. Again, no party in the case contested whether the expert had adequately identified an alternative design. And in fact, the *Sandifer* court reiterated that the Fifth Circuit's directive in design-defect cases is that courts "should critically examine alternative design ideas offered by experts to insure that they go beyond 'mere conceptualization' and demonstrate feasibility." *Id.* Such is the task of this Court.

Because plaintiff's experts have failed to sufficiently identify a specific alternative design for the Crown RM6000 that could have prevented plaintiff's injuries, he is unable to satisfy his burden under the LPLA. Accordingly, Crown is entitled to summary judgment dismissing plaintiff's claim that the forklift was defective in design.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Crown's motion for summary judgment. Plaintiff's claim of defective design is DISMISSED.

New Orleans, Louisiana, this __20th__ day of January, 2022.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE