IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RODNEY JONES, et al.                                                      PLAINTIFFS

V.                                                    CIVIL ACTION NO. 3:20-CV-308-SA-RP

THE RAYMOND CORPORATION                                                    DEFENDANT

ORDER AND MEMORANDUM OPINION

On November 18, 2020, Rodney Jones and Deangela Battle initiated this civil action by filing their Complaint [1] against The Raymond Corporation. The parties have engaged in extensive motion practice, and there are currently ten pending Motions [109, 111, 113, 115, 117, 119, 121, 123, 125, 127] in the case. Having reviewed the filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

Rodney Jones was previously employed by Abacus Corporation, a temp agency. Through this employment, Jones was contracted to operate a lift truck at a FedEx Supply Chain warehouse in Olive Branch, Mississippi. On August 29, 2019, Jones was operating a lift truck when he was involved in an accident, during which his left foot left the operators' compartment of the lift truck. Jones' left leg was crushed. Due to the severity of Jones' injuries, doctors were forced to amputate his left leg below the knee. The Raymond Corporation manufactured the lift truck Jones was operating at the time of the accident. This lawsuit followed.

The lift truck which Jones was operating at the time of the accident was a Raymond 4250 counterbalanced stand-up narrow-aisle forklift. As stated by one of the Plaintiffs' designated experts, John Meyer: "The Raymond 4250 stand-up forklift is a compact machine that was designed and sold for use in tightly defined spaces such as the narrow-aisle warehouse

environment. . . It was expected to frequently be operated in a forks-trailing fashion with numerous stops, starts and other maneuvers." [119], Ex. 2 at p. 1-2.

For purposes of the present filings, there are three noteworthy components of this type of lift truck. There is a multi-function control handle which "controls direction (forward/reverse) and speed" and a steering tiller which is "utilized by the operator to steer[.]" [116] at p. 2. There is also a deadman pedal—a feature used for emergency stops—located in the area where the operator's feet are located.

To operate the lift truck, the operator places one foot (typically the right foot) on the deadman pedal and moves the multi-function control handle forward or backward in the direction the operator desires to go. To stop the lift truck, the operator moves the multi-function control handle "through neutral to the direction opposite his current path of travel." *Id*. at p. 3. This technique is referred to as "plugging." *Id*. In an emergency situation, the operator can also stop the lift truck "by quickly lifting his foot off the deadman pedal, which stops the truck in the shortest possible distance." *Id*. To the operator's left, there is an opening which is wide enough for the operator to enter or exit the forklift. The subject forklift did not have a door—thus, the opening remained open at all times, including during Jones' use of it.

Turning to the specific facts of this case, the Court quotes a portion of Raymond's Memorandum [116], which is in essence a summary of Jones' deposition testimony:

> Prior to the accident, Mr. Jones' right hand was on the multiple function control, his left hand was on the steer, and his right foot was on the deadman (emergency brake) pedal. He did not remember whether he was leaning against the back pad in the compartment, but testified that he did not always do so. Mr. Jones testified that, as he was turning, he felt like he ran over something, which caused his body to jump and lose control of the steer. He claims he pulled up on the steer tiller in an attempt to stay in the truck, which according to him caused the lift truck to accelerate and hit a nearby rack. Mr. Jones' left foot was outside of the compartment at the time of impact

and was crushed. Mr. Jones testified that he did not know how his
left foot exited the compartment, and that he did not know exactly
how his leg was crushed.

[116] at p. 5.

Jones asserts seven claims against Raymond, specifically contending Raymond should be held liable for: (1) defective design; (2) failure to warn; (3) negligence; (4) breach of express warranties; (5) breach of implied warranty of merchantability; (6) breach of implied warranty of fitness for particular purpose; and (7) strict liability. In addition to compensatory damages, Jones asserts a claim for punitive damages. Deangela Battle (Jones' wife) (collectively "the Plaintiffs") also brings a loss of consortium claim.[1]

The Plaintiffs have designated three experts, John Meyer, PhD, PE; Jason Kerrigan, PhD; and John Jeka, PhD. Each of these experts has prepared a written report. Raymond has filed separate Motions [109, 111, 113] as to each of them, seeking to strike their respective testimonies in full. Conversely, the Plaintiffs have filed dueling Motions [119, 121, 123] as to each of their own experts, seeking "a ruling from this Court that [the experts'] opinions and testimony . . . meet the requirements of Federal Rule of Evidence 702." [120] at p. 1; [122] at p. 1; [124] at p. 1. On the other hand, the Plaintiffs have filed Motions [125, 127] seeking to exclude the testimony of Raymond's experts, Kathleen A. Rodowicz, PhD and Michael Rogers, PE.

Raymond has also filed a Motion for Summary Judgment [115], as well as a separate Motion for Partial Summary Judgment [117] which relates solely to the Plaintiffs' punitive damages claim.

---

[1] New Hampshire Insurance Company, the company that provided workers' compensation insurance coverage for Abacus Corporation at the time of the accident, has filed an Intervenor Complaint [40], asserting entitlement to reimbursement for payments made to Jones as a result of this accident.

*Analysis and Discussion*

The Court will first address the parties' respective requests to exclude the opposing party's experts. Then, the Court will resolve Raymond's requests for summary judgment.

I.     *Expert Testimony in General*

The parameters of admissible expert testimony are set forth in Rule 702 of the Federal Rules of Evidence. FED. R. EVID. 702; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). The Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

"In *Daubert*, the Supreme Court 'explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 459 (1993)). The first prong—reliability—"mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Id.* (quoting *Curtis*, 174 F.3d at 668; *Daubert*, 509 U.S. at 590) (additional citation omitted). As to the

relevance prong, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (citation omitted). The proponent must "demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis*, 174 F.3d at 668; *Daubert*, 509 U.S. at 592-93).

The proponent bears the burden to establish that the proposed expert testimony meets this standard. *See Curtis*, 174 F.3d at 668 (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)); *see also Andrews v. Rosewood Hotels & Resorts, LLC*, 575 F.Supp.3d 728, 733 (N.D. Tex. 2021) ("The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence."). Importantly, the district court's role as gatekeeper "is not meant 'to serve as a replacement for the adversary system: Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Andrews*, 575 F.Supp.3d at 735 (quoting *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (additional citations omitted).

A.    *Preliminary Issue*

Prior to addressing the parties' specific requests to exclude certain expert testimony, the Court will address one preliminary matter at the outset. The Plaintiffs have filed three separate Motions [119, 121, 123] concerning *their own* experts. All of these Motions [119, 121, 123] make essentially the same argument—specifically seeking "a ruling from this Court that [the experts'] opinions and testimony . . . meet the requirements of Federal Rule of Evidence 702." [120] at p. 1. Although the Plaintiffs state that they "do not seek to have [the experts'] opinions admitted before

trial," they do request a finding that if any of the three experts are offered as an expert in the trial of this matter, that "the opinions identified herein meet the demands of Rule 702." *Id.*

The District Court for the Middle District of Florida, in a case involving many of the same attorneys who represent the Plaintiffs in the case *sub judice*, denied motions of this precise nature (involving the same experts) on procedural grounds. *McHale v. Crown Equip. Corp.*, 2021 WL 289346, at *2 (M.D. Fla. Jan. 28, 2021). In *McHale*, the district court concluded:

> Plaintiffs seek to admit, and Crown seeks to exclude, expert opinions of John Meyer, Ph.D, P.E. In summary, as Crown correctly contends, *Plaintiffs' motion is premature*. Even if Meyer is permitted to testify as an expert, Plaintiffs must lay the proper foundation for his opinion testimony at trial.

*Id.* (emphasis added).[2]

This Court recognizes that *McHale* is not binding. However, the Court finds its reasoning persuasive. The Plaintiffs' requests are premature and, in essence, ask the Court to issue an advisory opinion as to the admissibility of the potential expert testimony of the Plaintiffs' own experts. The Court will not do so. However, the Court will hereinafter analyze Raymond's arguments in opposition to the proposed testimony, thereby addressing many of the potential issues associated with the testimony.

The Motions [119, 121, 123] are DENIED. The Court will address the admissibility of any offered expert testimony at trial so that all considerations, such as whether there has been a proper foundation, can be taken into account.

---

[2] For the sake of clarity, the Court notes that Crown Equipment Corporation—the defendant in *McHale*—is one of Raymond's competitors in the forklift market. As discussed in more detail below, there have been numerous lawsuits filed across the country (many of which have been filed by the same counsel representing the Plaintiffs in the case *sub judice*) against both Raymond and Crown for injuries of this nature.

B.      *Plaintiffs' Expert John Meyer, PhD, PE*

The Plaintiffs timely designated John Meyer to testify as an expert in support of their claims. Raymond has filed a Motion [109] seeking to strike Meyer's proposed testimony in full.

Meyer submitted a written report which contains fifteen opinions and conclusions, but Raymond has summarized and classified those opinions into four categories of alleged ways that the lift truck was defective: "(a) it lacked a door that would trap the operator into the operator's compartment, (b) its pedal design was defective, (c) it lacked a presence sensing switch in the backrest, and (d) the multifunction control joystick allows an operator who loses balance to accelerate the forklift rearward." [110] at p. 1. Raymond raises four separate arguments as to why it believes Meyer should be precluded from providing any expert testimony at trial.

First, Raymond contends that Meyer "is not qualified to offer design opinions related to the Raymond Model 4250 because he has no relevant experience, education, or training related to the design and operation of lift trucks, particularly the Model 4250." [110] at p. 2. Raymond makes numerous sub-arguments in support of this contention, emphasizing that Meyer has never designed a stand-up lift truck, never designed a component of a stand-up lift truck, never designed a warning or instruction for a stand-up lift truck, and (prior to being retained by the Plaintiffs' counsel) never worked on any matters involving stand-up lift trucks. Raymond also notes that Meyer has never published any written work regarding forklifts and that he is not an expert lift truck operator.

Meyer's curriculum vitae ("CV") is attached to his written report. The Court has reviewed it carefully and notes that Meyer's qualifications include extensive education, experience, affiliations, and honors. Furthermore, Meyer provided copies of extensive documentation he reviewed and considered in developing the opinion listed in his report.

As to Raymond's contention that Meyer's testimony must be excluded because he has never specialized solely in stand-up lift trucks, the Plaintiffs direct the Court's attention to a relatively recent per curiam Fifth Circuit opinion. *Cedar Lodge Plantation, LLC v. CSHV Fairway View I, LLC*, 753 F. App'x 191 (5th Cir. 2018). In that case, Cedar Lodge, an entity that owned property adjacent to the Fairway View Apartments, filed suit against Fairway View on the basis that a pond on Cedar Lodge's property had become contaminated due to "the negligence of Fairway View . . . [which] resulted in the discharge of harmful or hazardous substances, pollutants, or contaminants, including raw sewage, onto Cedar Lodge's property." *Id*. at 194. The district court found that Cedar Lodge's environment expert (Suresh Sharma) "was not qualified to offer reliable expert testimony because his experience was related to the resolution of hazardous waste matters for commercial and industrial facilities, rather than sewerage systems for apartment complexes or multi-family residential communities." *Id*. at 195. On appeal, the Fifth Circuit reversed this decision, noting that "Sharma has extensive experience in analysis and evaluation of environmental contaminants, the area in which he was offered as an expert, . . . *His lack of specialization in sewage facilities for multi-family residential units like those in this case does not render his testimony unreliable*." *Id*. at 195-96 (emphasis added).

Similarly here, although Meyer may not have specifically specialized in stand-up lift trucks, he has experience in engineering design, product design, accident investigation, and accident reconstruction. The Court rejects Raymond's argument that Meyer is not qualified. Raymond's concerns as to any of Meyer's perceived deficiencies may be addressed at trial through cross-examination, but they do not constitute appropriate reasons to altogether exclude Meyer's testimony. To the extent Raymond seeks exclusion of Meyer's testimony on this basis, its request is denied.

Next, Raymond contends that all of Meyer's opinions are unreliable because: "None of his design opinions are based on the application of a reliable engineering methodology[.]" [110] at p. 2. Raymond emphasizes that Meyer "conducted no testing in this case" and "the bulk of [his] work in this case merely involved reviewing materials provided to him[.]" *Id.* at p. 6, 7. Further, Raymond notes:

> Though Dr. Meyer claims he performed "analysis" of whether certain of his alternative designs would have made a difference in Mr. Jones' accident, he lacks critical data points to make such a determination. Specifically, Dr. Meyer does not know the speed of the subject lift truck at the time of impact. Nor does Dr. Meyer know how close the subject list truck was to the point of impact when Mr. Jones removed his left foot from the operator's platform.

*Id.* at p. 7 (citations and emphasis omitted).

As noted above, Meyer identified four separate theories as to how the lift truck was defective—(1) that the lift truck should have had a door; (2) that there should have been a brake pedal under each foot; (3) that there should be an operating presence sensing switch in the backrest; and (4) that the multifunction control handle should have been designed so that it would not accelerate when an operator pulls it in an emergency situation as occurred in this case. Meyer identified alternative designs for each of these areas—the inclusion of a door, a modified pedal design which is similar to the pedals of an automobile, the inclusion of a sensor in the backrest which would ensure "that the operator remains in the most stable operating position," and a modified control handle which "does not accelerate when the joystick is pulled on towards the opening of the operator compartment as the operator falls out[.]" [165] at p. 11-13.

Regarding Raymond's argument as to Meyer's lack of knowledge as to the precise speed of the lift truck at the time of the accident, "an expert's knowledge of the specifics of a crash 'go primarily to the weight, not the reliability, of his opinions.'" *Hankins v. Ford Motor Co.*, 2011 WL

6046304, at *3 (S.D. Miss. Dec. 5, 2011) (quoting *Betts v. General Motors Corp.*, 2008 WL 2789524, at *6 (N.D. Miss. July 16, 2008)). Stated differently, "an expert's role or lack thereof in testing a defective product (or its proposed remedy, etc.) typically goes toward weight." *Wells v. Robinson Helicopter Co., Inc.*, 2015 WL 1427528, at *2 (S.D. Miss. Mar. 27, 2015) (citing *Hankins*, 2011 WL 6046304 at *4).

Despite Raymond's contentions, the Court is satisfied that Meyer's proposed testimony satisfies *Daubert*. Meyer's report sets forth in significant detail the methodology which he used, including the materials which he reviewed, in reaching his conclusions. Meyer engaged in a reconstruction of the accident and ultimately concluded: "My reconstruction of this event allows me to reach four primary conclusions, to a reasonable degree of engineering certainty, as to the causal link between the design of the forklift and Mr. Jones' injuries." [119], Ex. 2 at p. 37. The report then goes on to explain the conclusions.

Having considered Meyer's report, the Court rejects Raymond's argument that Meyer's opinions are altogether unreliable. The Court will not exclude Meyer's proposed testimony on this basis, but Raymond will be permitted to question Meyer regarding the same at trial.

Raymond's third argument relates solely to Meyer's opinion concerning the need for a door. Specifically, Raymond contends that "Meyer's door opinions are unreliable because they are universally rejected by the relevant scientific community." [110] at p. 15. In urging the Court to exclude this opinion, Raymond argues that the safety standards promulgated by the American National Standards Institute ("ANSI") "specifically requires that lift trucks such as the Model 4250 be designed with open operator compartments." *Id.* at p. 16. Raymond specifically directs the Court's attention to a case originating from the District Court for the Northern District of Ohio, wherein that court excluded the plaintiff's expert, Thomas Berry, from testifying in a case against

10

Raymond involving nearly synonymous facts. *Lawrence v. Raymond Corp.*, 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011).

In *Lawrence*, the plaintiff sought to admit Berry's opinion that the lift truck "was defectively designed because it did not have a latching rear door." *Id*. at *6. In finding that the opinion should be excluded, the district court emphasized that "Berry claims to have originally formulated his opinion while working on a project for ATI and there is no clear statement of the amount of work ATI did in connection with litigation and it is unclear where the project Berry worked on when he formulated his opinion concerning latching rear doors was connected with litigation." *Id*. The district court further explained flaws in Berry's testing, such as incomplete statistical analysis and the fact that his physical testing as to the potential damages that could occur did not "establish that the [machine] is riskier without a latching door than with one. Without even addressing design flaws, Berry has only addressed the potential damage from one of the two types of accidents and one aspect of the alternative design." *Id*. at *7. Specifically noting Berry's "lack of detail and reliance on obviously incomplete data and testing," the district court found his methods to be unreliable. *Id*. at *8. The district court also noted that "no manufacturer offers standard rear doors, let alone a latching door," such as the one for which Berry advocated. *Id*. Overarching all of this analysis was the general rule in the Sixth Circuit that "if a proposed expert is a quintessential expert for hire, then it seems well within a trial judge's discretion to apply the Daubert factors with greater rigor." *Id*. at *6 (quoting *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)) (internal quotation marks omitted). The district court excluded Berry's testimony, and that ruling was affirmed on appeal. *See Lawrence v. Raymond Corp.*, 501 F. App'x 515, 518 (6th Cir. 2012).

This Court finds *Lawrence* distinguishable. First, the district court there applied a heightened rigorous standard since Berry was a quintessential expert for hire. This was in accordance with Sixth Circuit law, but Raymond cites no such authority from the Fifth Circuit, nor does it argue that the Court should apply such a standard here. Furthermore, this Court does not have the same concerns with Meyer's methods in the case sub judice as the *Lawrence* court did, which included the utilization of incomplete data and testing as to only some damages. In short, *Lawrence* is inapposite.

Recognizing Raymond's arguments, the Plaintiffs emphasize that "[a]s just one example of a door suggested by Dr. Meyer, Raymond sells a door that is designed to fit the Raymond 4250 forklift. Raymond offers a full door assembly that includes the door, hinges, screws, pad, decal, and guard. If this door assembly was installed on Jones's forklift he would not have been injured." [165] at p. 11-12 (internal citations omitted). The Court finds this argument to be persuasive.

Although *Lawrence* is distinguishable, the Court notes that Raymond points to many other cases wherein experts seeking to testify against it have been excluded by various courts across the country. *See*, *e.g.*, *Brown v. Raymond Corp.*, 318 F.Supp.2d 591, 599 (W.D. Tenn. May 4, 2004) (excluding expert on the basis that "while [the expert's] hypotheses are capable of being tested, they have not been. . . He has no basis for concluding that the forklifts are unreasonably dangerous based on design defect."). For their part, the Plaintiffs point to numerous cases across the country wherein courts have permitted testimony of this precise nature as well. *See*, *e.g.*, *Vazquez v. Raymond Corp.*, 2019 WL 176106, at *4 (Jan. 11, 2019) (denying motion to exclude testimony of Thomas Berry); *Reinard v. Crown Equip. Corp.*, 2018 WL 547239, at *1 (N.D. Iowa Jan. 24, 2018) (denying motion to exclude experts (including Thomas Berry) because "after reviewing the [plaintiffs'] extensive responses to the motions to exclude the testimony of these experts, my

'preliminary assessment' is that these experts are qualified to state their proffered opinions, the reasoning and methodology underlying the challenged opinions are scientifically valid, and the experts' reasoning and methodology can be applied to the facts in issue."). While it will not compare and contrast the facts of every one of these cases to the case *sub judice* (and the list provided above is not an exhaustive one), the Court feels compelled to note its cognizance of them, considering that the parties expend considerable time in their briefs referring to the cases which have been decided in their favor.

However, considering the specific facts of *this* case and having taken into account Raymond's arguments, the Court finds that exclusion is *not* warranted at this time. The Court finds particularly persuasive the District Court for the Middle District of Florida's holding on this topic in *McHale*:

> In Opinions 1, 2, 3, 4, and 7, Meyer opines that McHale's injury resulted from the lack of a door, which constitutes an unacceptable risk of injury, and that the addition of a door or right brake pedal would reduce risk. Crown's challenge to these opinions focuses on the rejection of the 'door theory' by some courts under *Daubert. See, e.g.*, *Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001). However, in reaching his opinions, Meyer relies on testing, data, and alternative designs that were not considered in *Dhillon*. Further, courts in this Circuit have found that 'where the proposed alternative design has been produced and put to practical use in the industry, the expert does not need to personally test it to satisfy *Daubert*.

*McHale*, 2021 WL 289346 at *3 (some internal citations omitted).

This Court likewise finds that Meyer has explained his reliance on testing, data, and alternative designs in reaching his conclusions. Although the Court is aware of Raymond's arguments in opposition to Meyer's testimony, they do not warrant exclusion but can instead be addressed through cross-examination.

The Court also feels compelled to address another contention raised by Raymond:

> Even in the cases in which Plaintiffs' counsel was able to persuade trial judges to permit door opinions to be presented to the jury, the jury returned verdicts all in favor of either Raymond or Crown. In other words, these door opinion[s] have either been excluded pretrial or rejected by jurors at the end of a trial. Given Dr. Meyer's lack of any experience with lift truck design or testing, the Court should not waste its precious trial time in this instance.

[110] at p. 15 n. 8.

This argument misses the mark. The Court's role at this stage of the proceedings is to act as a gatekeeper to ensure that reliable and relevant testimony is presented to the jury—not to invade the province of a jury. *See, e.g., Coleman v. BP Exploration & Prod., Inc.*, --- F.Supp.3d ---, 2022 WL 2314400, at *3 (E.D. La. June 28, 2022) (quoting *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1980)) ("[I]n determining the admissibility of expert testimony, the district court must accord the proper deference to 'the jury's role as the proper arbiter of disputes between conflicting opinions.'"). The Court rejects this argument in full.[3]

For these reasons, Raymond's Motion [109] to strike the expert testimony of Meyer is DENIED.

### C. Plaintiffs' Expert Jason Kerrigan, PhD

In his written report, Kerrigan provides the following overarching opinion:

> In general, it is my opinion that the subject forklift, and, more generally, standup counterbalanced forklifts, are unreasonably dangerous. The subject forklift incorporates several design features that present unreasonable risks to operators including the absence of restraints and an occupant compartment door, the location of the open occupant compartment doorway, the configuration of the right-hand controls, and the location of the "deadman" brake. All of these deficiencies could have been mitigated by the use of alternative

---

[3] Raymond also raises an argument that Meyer's testimony should be excluded because he is "simply parroting the defect opinions of other purported experts, including Mr. Berry[.]" [110] at p. 17. The Court sees no need to address this issue in great detail, as it has already explained above its finding that Meyer has himself engaged in appropriate methodology to support his opinions. This argument is rejected.

> designs that were readily available at the time the forklift was
> designed and which would not have negatively affected the utility
> of the forklift for its primary purposes of lifting, carrying and
> lowering materials.

[162], Ex. 5 at p. 7.

Kerrigan also notes his awareness that defense experts in other similar cases "have argued that standup forklifts should not have doors because doors would increase operator egress time beyond the available time operators have to safety exit a moving forklift at the time of a tip-over or off-dock accident." *Id*. at p. 14. He notes that defense experts often rely on results from accident tests performed with anthropomorphic test devices ("ATDs") to "predict human injury risk in such accidents [and] show that severe injuries can occur when occupants stay on forklifts during off-docks and tip-overs." *Id*. However, Kerrigan holds the opinion that ATD testing is not substantially similar to the manner in which accidents of this nature actually occur and therefore should not be utilized as a basis in making engineering decisions.

Raymond attacks Kerrigan's opinions on multiple fronts, contending that he should be prohibited from testifying altogether. First, Raymond contends that Kerrigan "is not qualified to offer lift truck design opinions." [112] at p. 9. Raymond concedes that Kerrigan is a biomechanical engineer with extensive experience but takes the position that he "lacks any relevant experience, education, or training related to the design or operation of stand-up lift trucks," specifically emphasizing that has never designed a forklift truck and has only himself spent a minimal amount of time physically on a forklift. *Id*. The Court finds noteworthy one particular point of clarification in the Plaintiffs' Memorandum [163]—specifically, they state that "Dr. Kerrigan is not offering 'design' opinions in the traditional sense. Rather, he explains how the alternative designs Dr. John Meyer offers would have prevented or reduced the likelihood of Jones's injuries." [163] at p. 5.

This clarification is noted and will be enforced at trial. To the extent Raymond seeks to prohibit Kerrigan from offering design opinions, the request is granted. However, the Court finds that he is otherwise qualified to testify regarding the alternative designs offered by Meyer and his opinion as to the effect those designs would have had.

Next, Raymond contends that Kerrigan's "design opinions are unreliable for the reason that, other than the concept phase, he did not engage any of the engineering methodology which, by his own admission, is necessary to the design process." [112] at p. 10. Raymond further emphasizes that Kerrigan "has admitted that he cannot offer the requisite causation opinions that are necessary to make [his] *ipse dixit* design concepts relevant to this case. He only offers opinions that the proposed alternative designs might have made a difference in Mr. Jones' accident — not that they would have made a difference." *Id*. at p. 12.

The Court rejects these arguments. Despite Raymond's characterization of his methodology (or lack thereof), Kerrigan's report is thorough and explains the steps in which Kerrigan engaged to reach his opinions. Regarding the likelihood that the alternative designs would have prevented Jones' injuries, it is not required that an expert be absolutely certain that an alternative design would have prevented any particular injury. *See*, *e.g.*, *Daubert*, 509 U.S. at 590 ("[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."). But Kerrigan's report clearly includes his opinion that "[i]f [the subject forklift] had incorporated design details that were readily available at the time of Mr[.] Jones' injury, it is my opinion to a reasonable degree of engineering certainty that Mr. Jones would not have been injured." [162], Ex. 5 at p. 5. This is sufficient.

Raymond then raises the argument that Kerrigan's "door opinions are unreliable because they are universally rejected by the relevant scientific community, and he may not simply be a

mouthpiece for other non-testifying witnesses." [112] at p. 12. Raymond admits that this is the same argument raised in connection with Meyer. The Court has already addressed it above and sees no need to address it further. However, the Court does again emphasize the clarification noted above—particularly, that Kerrigan's testimony regarding alternative designs will be limited to "how the alternative designs Dr. John Meyer offers would have prevented or reduced the likelihood of Jones's injuries." *See* [163] at p. 5.

Next, Raymond asserts that Kerrigan's criticisms of Raymond's utilization of ATD testing should be excluded because they are not generally accepted by the relevant scientific community. To summarize, Kerrigan's opinion on that issue is that Raymond should not rely upon ATD testing because it is not indicative of real-world accidents of this nature. In reaching this conclusion, Kerrigan engaged in several steps which are set forth in his report and summarized in the Plaintiffs' Memorandum [163]. Kerrigan essentially engaged in six steps: (1) analyzed previous ATD testing of Raymond and other forklift manufacturers; (2) reviewed research on history and development of ATD devices; (3) analyzed the ability of the ATDs in the forklift ATD testing to predict human injury; (4) analyzed whether the ATD testing mimicked what happens to forklift operators in real-world accidents; (5) analyzed the use of ATDs to predict injury potential and compared that information to how ATDs are used in forklift testing; and (6) conducted research to determine the veracity of Raymond's claim that a real-life human would not be able to take self-protective measures before a tip-over or off-dock.

After employing these steps, Kerrigan reached the conclusion that ATD testing should not be utilized because the ATDs do not accurately mimic human behavior as it would actually occur in an accident. Raymond counters by emphasizing that Kerrigan's theory has only garnered

minimal support, he "has no alternative solution for testing," and "ATD use in this specific context has been peer-reviewed and accepted by the relevant scientific community." [112] at p. 14.

Although well-aware of Raymond's arguments in opposition to Kerrigan's opinions, the Court finds that they go to the weight that a factfinder should assign to the opinions—not their admissibility. Kerrigan has engaged in a thorough process to reach his conclusion and explained the same in his report. Raymond can challenge Kerrigan's opinions and credibility on cross-examination at trial. *See Daubert*, 509 U.S. at 596. The Court notes that the District Court for the Northern District of Georgia recently reached the same conclusion in a forklift accident case involving Raymond: "The proper remedy for Defendants' concerns about Dr. Kerrigan is to challenge the weight of the testimony and his credibility at trial." *Vazquez*, 2019 WL 176106 at *4.

Lastly, Raymond makes a brief argument that "Kerrigan's review of Crown accident data is unreliable and irrelevant." [112] at p. 15. Raymond contends that Kerrigan should have looked to accident reports from prior Raymond accidents—as opposed to data from Crown. On the other hand, the Plaintiffs assert that Raymond does not keep such data. The Court finds that this issue can be resolved at trial and does not constitute a basis for exclusion at this time. The argument is rejected.

Kerrigan's design opinions will, consistent with the explanation provided above, be limited. To the extent Raymond's Motion [111] sought such a limitation, it is GRANTED. The Motion [111] is DENIED in all other respects.

D.      *Plaintiffs' Expert John Jeka, PhD*

John Jeka holds a master's degree in psychology and a PhD in neuroscience, and much of his professional experience involves studying human balance. In his report, Jeka sets forth six primary opinions:

(1)     The operation and use of stand-up forklifts present challenges to the operator's balance.

(2)     The operator's response to balance disturbances associated with stand-up forklift operation foreseeably includes movement of the operator's left foot to the operator's left.

(3)     The operator's movement of his left foot as an aid to balance is not voluntary.

(4)     The plaintiff operator's left foot, more likely than not, to a reasonable degree of scientific certainty, moved leftwards as part of an automatic balance retention process, immediately prior to the event, indicating and precipitating a loss of balance that [led] him to partially fall from the forklift resulting in the injuries suffered by the Plaintiff.

(5)     Manufacturers of standup forklifts must recognize that the left foot can leave the operator compartment due to an **involuntary** balance response and need to protect the operator accordingly.

(6)     From a balance point of view, the design changes suggested by Dr. John Meyer, Ph.D. make sense and more likely than not, had they been implemented on the forklift being operated by the Plaintiff Mr. Jones would have made [a] difference in the outcome of the event and protected him from injury.

[160], Ex. 3 at p. 4 (emphasis in original).

Through the present Motion [113], Raymond raises two arguments for exclusion of Jeka's opinions. First, Raymond avers that Jeka is "not qualified to offer opinions about lift truck operation or lift truck operator balance." [114] at p. 8. More particularly, Raymond concedes that Jeka "has general experience in the field of kinesiology, and with respect to human balance, but

his education, training, and experience have never involved lift trucks until being retained by Plaintiffs' counsel about two years ago, and he has not done any work to connect his general expertise to the issues relevant in this case to lift truck operation." *Id*.

The Court is unpersuaded. Similar to its finding in connection with Raymond's argument to exclude Meyer's testimony, the Court finds this argument to constitute as attempt to impose a specialization far too specific. As emphasized above, "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility, and an expert witness is not strictly confined to his area of practice, but may testify concerning related applications." *Cedar Lodge*, 753 F. App'x at 195 (citations omitted). Jeka is certainly well-qualified, and the Court rejects Raymond's contrary contention.

Rather, consistent with the applicable law as articulated by the Fifth Circuit, the Court will "assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. This leads the Court to Raymond's second argument—that Jeka's opinions "do not result from applying a reliable methodology[.]" [114] at p. 9. To support this argument, Raymond asserts that Jeka "engaged in no methodology at all, other than reading some materials that Plaintiffs' counsel found for him, and talking to Mr. Jones and accepting his statements as true." [114] at p. 10.

The Court finds Raymond's argument to be an oversimplification. As the Plaintiffs emphasize, Jeka's report sets forth his qualifications related to human balance, discusses the operation of a standup forklift and its connection with human balance, and explains how humans "respond naturally when it is anticipated that they are about to experience a challenge to balance." [161] at p. 6. The Plaintiffs contend that he then "relates all of these issues to the available research

on human balance." *Id*. Jeka thereafter reaches the conclusion that Jones' left foot moved leftward as part of an automatic balance retention process.

The Court finds that Jeka should be permitted to testify on this topic, as his opinions are relevant and reliable and will ultimately assist the trier of fact. In its Memorandum [114], Raymond emphasizes that "Dr. Jeka spent just 3.66 hours on the conference talking with Mr. Jones and writing his report. He spent another 1.85 hours preparing for his deposition." [114] at p. 4 (citations omitted). In the Court's view, this goes to the weight which should be assigned to his testimony and can be properly addressed through cross-examination.

Although finding that Jeka should be permitted to testify as to most of his opinions, the Court does note an area that Jeka will not be permitted to delve into. First, the Court notes again the sixth conclusion in Jeka's report:

> (6) From a balance point of view, the design changes suggested by Dr. John Meyer, Ph.D. make sense and more likely than not, had they been implemented on the forklift being operated by the Plaintiff Mr. Jones would have made [a] difference in the outcome of the event and protected him from injury.

[160], Ex. 3 at p. 4.

When specifically questioned about this opinion in his deposition, Jeka provided the following response: "You know, I think having a door on there would have been a good idea. But *I'm not a design expert, so I shouldn't really be commenting on that in a strong way*." [113], Ex. 2 at p. 25 (emphasis added).

The Court finds Jeka's admission telling. As emphasized above, Jeka is qualified to provide expert testimony on human balance. He is not an engineer, and he has not otherwise shown that he is qualified to provide any design opinions. Therefore, the Court finds that he is not qualified to testify on that particular topic. In essence, the Court will permit Jeka to testify regarding human

balance—the area in which he is an expert—but he cannot testify about design defects or other areas that clearly exceed the scope of his expertise.

To the extent Raymond seeks exclusion of the sixth opinion listed in Jeka's report, the request is GRANTED. In all other respects, Raymond's Motion [113] is DENIED.

E.     *Raymond's Expert Kathleen A. Rodowicz, PhD, PE*

Raymond designated Kathleen A. Rodowicz, a biomechanical engineer, as one of its experts. Rodowicz prepared a written report which, after setting forth the reasoning and methodology employed, states the following ten conclusions:

> (1)     Mr. Jones voluntarily placed his left foot outside, to the left, and below the operator compartment of his lift truck prior to the impact with the wooden pallet/racking, consistent with him attempting a fend-off maneuver;

> (2)     The position and orientation of Mr. Jones' left foot and leg at the time of his injury is inconsistent with a loss of balance or with him "broadening his stance" as a result of a challenge to his balance;

> (3)     Mr. Jones' left foot and leg injuries occurred primarily due to medial-lateral compression of his left foot and leg as his foot and leg were compressed between the wooden pallet/racking and his lift truck;

> (4)     Had Mr. Jones remained within the operator compartment of his lift truck during the subject accident, he would not have been injured;

> (5)     The operator compartment of the subject lift truck provides an operator with a base of support that is sufficient for him to react to the motions of the truck in such a way that he can maintain his position within the operator compartment during normal operating procedures;

> (6)     Plaintiffs' experts provide no data to establish that a dual-pedal design or an occupant presence sensor in the back pad would have prevented or mitigated Mr. Jones' injuries;

(7)     Dr. Kerrigan has not provided design details regarding his hypothetical restraint designs and no data to support his opinion that such a design would have prevented Mr. Jones' injuries during the subject accident;

(8)     There are no data to indicate that the presence of a rear door would prevent an operator from volitionally placing a lower extremity outside of the running lines of a lift truck or from involuntarily pushing the door open and placing the lower extremity outside of the running lines of the truck during an alleged loss of balance, as Dr. Jeka opines. If Mr. Jones' lift truck had been equipped with a rear door and he moved outside the operator compartment prior to the impact, his left foot and leg would still have been at risk of comparable injury.

(9)     As demonstrated by ATD testing and simulations conducted by myself and others, an operator who remains within the operator compartment of a stand-up lift truck during an off-dock or tip-over event is at risk of sustaining a serious or greater injury, including a fatal head injury.

(10)    The use of the Hybrid III ATD and/or a computational model of the Hybrid III ATD to examine injury potential during lift truck industrial accidents is a methodology that has been accepted by the scientific community and published in the peer-reviewed literature.

[125], Ex. 2 at p. 27-28.

Of these opinions, the Plaintiffs take issue with Rodowicz being permitted to testify in three broad areas. The first two contentions are that "[a]ll of Dr. Rodowicz's opinions that an operator compartment safety guard door, on a Raymond 4250 forklift, will make the forklift less safe should be excluded" and that "all of Dr. Rodowicz's opinions that a human being will be seriously injured or killed if they go off a loading dock in a Raymond 4250 forklift should be excluded." [126] at p. 6, 8. The Plaintiffs' main concern with these broad categories is that the opinions are based on ATD testing—they argue that "what is learned from ATDs propped up in falling forklifts does not fit a case in which the issue is what happens to human beings in falling

forklifts." [126] at p. 10. For clarification purposes, the Court notes that Rodowicz herself describes the ATDs as "crash test dummies[.]" [125], Ex. 2 at p. 18. The Plaintiffs emphasize that the ATD "does not act like a human" and that Rodowicz "does not know how her recreated event compares to real off-dock events." [126] at p. 13-14.

The Court cannot accept the Plaintiffs' contentions. According to Rodowicz and (at least implicitly) admitted by the Plaintiffs, ATD testing has been peer-reviewed and published and is generally accepted in the relevant scientific community. Rodowicz dedicated a significant portion of her report to explaining the utilization of ATDs to evaluate injury potential in various contexts, such as motorcycles, bicycles, trains, and buses.

The Plaintiffs may certainly emphasize on cross-examination the points raised in their Memorandum [126]. But the Court declines to altogether exclude the testimony, as it meets the requisite threshold for expert testimony.

Lastly, the Plaintiffs assert that "[a]ll of Dr. Rodowicz's opinions as to how and why Mr. Jones exited the forklift, including those to the effect that Mr. Jones intentionally exited the forklift, should be excluded." [126] at p. 18. They contend that it would be improper for Rodowicz to "argue to the jury that Mr. Jones 'volitionally' (i.e. intentionally) put his limb into harm's way." *Id.* at p. 19. Raymond contends that, in making this argument, the Plaintiffs misconstrue Rodowicz's opinions. Specifically, Raymond states that Rodowicz "does not comment on Mr. Jones' *intent* in her report, and will not comment on Mr. Jones' *intent* in her testimony." [147] at p. 21 (emphasis in original).

The Court sees nothing to exclude at this time. Certainly, Rodowicz should not be permitted to testify as to Jones' personal, subjective intent at the time of the accident, but her

report, in the Court's view, does not do so. Should she attempt to testify on that topic at trial, the Court will address it at that time.

The Court rejects the Plaintiffs' arguments as to Rodowicz's opinions and her anticipated testimony. The Motion [125] is DENIED.

F.    *Raymond's Expert Michael Rogers, PE*

Raymond has also designated as an expert Michael Rogers, a mechanical engineer. Rogers prepared a thorough report, at the conclusion of which he lists twelve opinions. For the sake of brevity, the Court will not list all twelve opinions since the Plaintiffs do not attack all of them; instead, the Court will focus on the opinions which the Plaintiffs seek to exclude. As stated by the Plaintiffs, the following opinions should be excluded:

(1)    All of Rogers' opinions that an operator compartment safety guard door, on a Raymond 4250 forklift, will make the forklift less safe should be excluded;

(2)    All of Rogers' opinions that there are no forces or movements associated with the use of the Raymond 4250 forklift, that can cause, or contribute to, a loss of balance should be excluded;

(3)    All of Rogers' opinions as to how and why Mr. Jones exited the forklift, including those to the effect that Mr. Jones intentionally exited the forklift, should be excluded;

(4)    All of Rogers' opinions about the statistical likelihood of a Raymond [M]odel 4250 forklift, as well [as] other kinds of standup forklifts, to be involved in an accident should be excluded;

(5)    All of Rogers' opinions about the history and bases of the ANSI/ITSDF B56.1 voluntary standards relating to ingress and egress should be excluded.

[128] at p. 3.

Concerning Rogers' opinions that adding a guard door would make the forklift less safe, the Plaintiffs first argue that Rogers' opinion should be excluded because he is not an expert on human actions. Raymond counters by noting that Rogers is an expert in accident reconstruction, which is precisely what he did in this case. The Court agrees with Raymond. Rogers' report explains in great detail the accident reconstruction efforts in which Rogers engaged and his theory as to how the accident occurred. Rogers is qualified to opine on that topic.

Additionally as to this topic, the Plaintiffs argue that the methodology underlying Rogers' opinion is not scientifically reliable. This argument is again based upon the Plaintiffs' disapproval of ATD testing. However, as explained above, there has been no contention that such testing is not the generally-accepted standard by the relevant scientific community. The Plaintiffs may cross-examine Rogers as to that topic, but the Court will not exclude the testimony.

Next, the Plaintiffs seek to exclude "all of Rogers' opinions that there are no forces or movements, associated with the use of the Raymond 4250 forklift, that can cause, or contribute to, a loss of balance[.]" [128] at p. 23. To be clear, Rogers' opinion on this topic is essentially that if an operator follows the appropriate training, there are no forces that would act to cause a limb to leave the compartment during normal operation and, as applied to this case, "[t]he forces acting on Mr. Jones would not cause a loss of balance or force any part of his body out of the compartment." [150] at p. 4.

This contention again goes to the accident reconstruction which Rogers performed. The report clearly explains the methods in which Rogers engaged to reconstruct the accident and thereafter concluded that "Jones most probably inadvertently steered the lift truck towards the rack, and accelerations from normal operation including steering are not sufficient to cause a loss of balance to an operator who has four or five points of contact." [150] at p. 8 (citations omitted).

The Court finds that Rogers is sufficiently qualified to provide this opinion, which is based upon his accident reconstruction and his experience with forklifts of this nature. Again, the Plaintiffs' concerns can be adequately addressed through vigorous cross-examination. *See Daubert*, 509 U.S. at 590.

Third, the Plaintiffs ask the Court to exclude Rogers' opinions "as to how and why Mr. Jones exited the forklift, including those to the effect that Mr. Jones intentionally exited the forklift[.]" [128] at p. 25.

The Court addressed this issue above in connection with the Plaintiffs' Motion [125] relating to Kathleen Rodowicz. As concluded in connection with that request, the Court agrees that Rogers should not (and will not) be permitted to testify as to Jones' subjective motive. However, the Court does not read the report as to render such an opinion. For example, as emphasized by the Plaintiffs in their Memorandum [26], Rogers' report specifically states "[w]hat is clear is that Mr. Jones steered the truck towards the rack, but it is unknown why he did." [127], Ex. 3 at p. 20.

Rogers will be permitted to testify regarding his accident construction, but he will not be permitted to testify about Jones' subjective motivation at the time of the accident. If he attempts to do so, the Court will take up that issue at trial.

Fourth, the Plaintiffs contend that Rogers should not be permitted to opine about the statistical likelihood of a Raymond Model 4250 forklift (or other types of standup forklifts) being involved in an accident. The Plaintiffs' entire argument on this point is as follows:

> Rogers intends to opine that the Raymond model 4250 is safe based on Bureau of Labor Statistics data on forklift incidents. He cannot share this data, or any opinion based on this data, because the data includes all kinds of forklifts. Rogers is unable to discern what percentage of the incidents relate to standup forklifts as compared to the other classes of industrial trucks included in the data.

[128] at p. 26 (internal citations omitted).

27

Raymond responds by emphasizing the manner in which Rogers uses the statistics: "Mr. Rogers uses this information to make a general point about the importance of operator training, as dictated by OSHA. The downward trend in accidents after OSHA instituted training requirements shows a correlation between increased training and decreased accidents." [150] at p. 15.

The Court agrees with Raymond. This information would likely be helpful to assist a jury in understanding the need for training and the industry as a whole. Any concerns regarding the testimony can be resolved through cross-examination.

Lastly, the Plaintiffs request exclusion of Rogers' opinions regarding "the history and bases of the ANSI/ITSDF B56.1 voluntary standards relating to ingress and egress[.]" [128] at p. 26. On this point, the Plaintiffs contend that Rogers should not be permitted to testify about the B56.1 committee's decision that doors should not be included on standup forklifts which are utilized in warehouses such as the one where Jones was injured. The Plaintiffs emphasize that the B56.1 standards "are voluntary standards, not government standards, and that doors are not mentioned anywhere in the standards." [128] at p. 26.

Raymond emphasizes that Rogers has extensive knowledge about the B56.1 safety standards because he is a sitting member of the committee. In his report, Rogers explains the history of the committee's consideration of doors.

The Court will defer ruling on this issue at the current time but will instead take up the issue at trial (outside of the presence of the jury if necessary) so that the appropriate foundation and context can be taken into account. Subject to that one caveat, the Plaintiffs' Motion [127] is DENIED.[4]

---

[4] The parties are directed to raise the issue associated with Rogers' testimony at trial, and the Court will take up the matter as necessary at that time.

II.    *Summary Judgment*

Raymond has filed two separate Motions for Summary Judgment [115, 117]. The Court will address them separately.

A.    *First Motion for Summary Judgment [115]*

Raymond's first Motion for Summary Judgment [115] seeks dismissal of all claims and is intertwined with its Motions to Strike [109, 111, 113] addressed above regarding the Plaintiffs' experts. In particular, Raymond argues that those experts should be excluded from testifying and "[w]ithout expert testimony of the purported defects and causation, their claims fail as a matter of law." [116] at p. 1. This argument is based upon the fact that lift truck designs and defects fall beyond the scope of layman's knowledge and require expert testimony. *See*, *e.g.*, *Brown v. Ford Motor Co.*, 121 F.Supp.3d 606, 612 (S.D. Miss. 2015) (granting summary judgment in favor of defendant after plaintiff failed to present expert testimony to support design defect theory).

Because the Court has already rejected Raymond's arguments to exclude the testimony of the Plaintiffs' experts—the only basis for Raymond's present request—the Motion [115] is DENIED.

B.    *Second Motion for Summary Judgment [117]*

Raymond's second Motion [117] relates only to the Plaintiffs' punitive damages claim. In the Complaint [1], the Plaintiffs contend that, despite being aware that lift trucks of this nature are dangerous and numerous operators have been injured while utilizing them, Raymond has refused to modify its design, incorporate necessary safety features, and/or incorporate necessary warnings. Raymond contends that the Plaintiffs have no evidence to satisfy the requisite threshold for punitive damages.

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

"Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed within caution and within narrow limits." *Warren v. Derivaux*, 996 So.2d 729, 738 (Miss. 2008) (citations and internal quotation marks omitted). "Punitive damages should be awarded in addition to actual or compensatory damages where 'the damages sustained import

insult, fraud, or oppression and not merely injuries, but injuries inflicted in the spirit of wanton disregard for the rights of others[.]'" *Id.* (quoting *Bradfield v. Schwartz*, 936 So.2d 931, 936 (Miss. 2006)). The primary purpose of punitive damages is to punish the wrongdoer and deter similar future misconduct. *Union Carbide Corp. v. Nix, Jr.*, 142 So.3d 374, 378 (Miss. 2014).

In the *McHale* case referenced multiple times above, the District Court for the Middle District of Florida, although permitting the plaintiffs' general liability claims to proceed to trial, granted summary judgment on the plaintiffs' request for punitive damages. *See McHale*, 2021 WL 808860 at *5. The district court specifically held that "although Plaintiffs raise several factual disputes as to the existence of a design defect and causation, the disputes are not material to the resolution of Plaintiffs' claim for punitive damages. Rather, the record demonstrates that, because Plaintiffs have not shown that Crown's conduct constituted 'intentional misconduct' or 'gross negligence,' punitive damages are not warranted." *Id*. The court ultimately concluded that "even if there are factual disputes about the benefits or risks involved with the addition of a door on the [forklift], the possibility that an alternative design might prevent some injuries is insufficient to establish that [the defendant's] conduct constituted intentional misconduct or gross negligence." *Id*. at *6.

Although recognizing that *McHale* is in no way binding, this Court finds its reasoning on point. Here, the Plaintiffs have pointed to no specific evidence that Raymond engaged in intentional misconduct or wanton disregard for the safety of its consumers. Further, while the Plaintiffs challenge Raymond's reliance on ATD testing, there has been no dispute that Raymond did in fact engage in such testing, nor have the Plaintiffs raised any dispute that such testing is generally accepted in the industry. The Plaintiffs may ultimately prevail on their general theories

of liability, but they have not come forward with any evidence to demonstrate that this case is one which warrants the extraordinary remedy of punitive damages.

Raymond's Motion [117] is GRANTED. The Plaintiffs' punitive damages claim is dismissed.

*Conclusion*

For the reasons set forth above, Raymond's Motion to Strike Meyer's Testimony [109] is DENIED; Raymond's Motion to Strike Kerrigan's Testimony [111] is GRANTED IN PART and DENIED IN PART; Raymond's Motion to Strike Jeka's Testimony [113] is GRANTED IN PART and DENIED IN PART; the Plaintiffs' Motion to Exclude Rodowicz's Testimony [125] is DENIED; and the Plaintiffs' Motion to Exclude Rogers' Testimony [127] is DENIED. The Plaintiffs' Motions [119, 121, 123] as to their own experts are DENIED.

Raymond's Motion for Summary Judgment [115] is DENIED. Raymond's Motion for Partial Summary Judgment [117] as to punitive damages is GRANTED. The Plaintiffs' punitive damages claim is DISMISSED *with prejudice*.

SO ORDERED, this the 18th day of January, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE